**UNITED STATES of America,**

v.

**Justin Wayne MATTHEWS, Defendant.**

**No. CR–02–S–549–M.**

United States District Court,
N.D. Alabama,
Middle Division.

Feb. 2, 2004.

P. Russell Steen, Birmingham, AL, for defendant.

Alice H. Martin, U.S. Attorney, James E. Phillips, U.S. Attorney's Office, U.S. Marshal, United States Marshal's Office, U.S. Probation, United States Probation Office, Birmingham, AL, for United States of America.

## MEMORANDUM OPINION

SMITH, District Judge.

This case is before the court on defendant's motion to reconsider his motion to dismiss the indictment.[1] The motion challenges the authority of Congress to regulate intrastate possession of a home-made video tape depicting defendant engaged in sexual acts with a minor.

## I. BACKGROUND

Justin Wayne Matthews made a video tape recording of himself engaged in various, consensual, sexual acts with a minor on some uncertain date during July or August of 2002.[2] Matthews then was twenty-two years of age, and the juvenile female was sixteen.[3]

The government filed a two-count indictment charging Matthews with sexual exploitation of children in violation of 18 U.S.C. § 2251(a), and possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). The government does not allege that any of the "*actual images of child pornography* produced by defendant in the conduct charged in the indictment were mailed, shipped, or transported in interstate commerce,"[4] nor does the government contend that defendant intended to sell, distribute, or exchange the tape or copies of it. Rather, federal jurisdiction is premised upon the fact that the camera used by defendant,[5] and the tape medium upon which images and sounds were recorded,[6] previously had traveled in interstate and foreign commerce.[7]

---

1. Following arraignment, defendant filed a motion to dismiss the indictment (doc. no. 27), but the magistrate judge to whom this case was assigned for pretrial proceedings recommended denial of the motion (doc. no. 32), and this court initially adopted the magistrate's report and recommendation (doc. no. 40). Defendant subsequently entered conditional pleas of guilty to both counts, reserving the right to challenge the court's jurisdiction, and to appeal the denial of his motion to dismiss on the basis of jurisdiction, among other issues. *See* Fed.R.Crim.P. 11(a)(2); doc. no. 37 (plea agreement) at 2; doc. no. 51 (transcript of Rule 11 plea colloquy) at 3 and 20. Prior to sentencing, however, defendant filed the present motion (doc. no. 41), asking this court to reconsider the order denying his motion to dismiss. The court granted the motion to reconsider (doc. no. 52), and conducted an evidentiary hearing to fully develop the factual underpinnings of the constitutional challenge.

2. *See* Gov. Ex. 1 (tape recording) and doc. no. 57 (transcript of Aug. 27, 2003 evidentiary hearing) (hereinafter "**Tr.**"), at 26 (acts consensual) and 35 (minor affirmed recording occurred in "either July or August" of 2002).

3. *See* doc. no. 51 (transcript of Rule 11 plea colloquy) at 34 (minor sixteen years old) and Tr. at 30 (minor's date of birth was June 19, 1986). The recording was made about 2:00 a.m. in the living room of the home in which the minor resided with her mother and father, while both parents were sleeping. Tr. at 33–34.

4. Tr. at 8–9 (stipulation of parties) (emphasis supplied).

5. *See* doc. no. 55 (Government's Notice of Anticipated Stipulations) and Tr. at 2–5.

6. Tr. at 5–8; *see also id.* at 9–18 (testimony of technical service representative for Sony Magnetic Products of America).

7. Thus, Count One of the indictment charges that:

## II. DISCUSSION

No decent citizen condones sexual relations between an adult and a minor, or the exploitation of minors for the satisfaction of deviate sexual desires. That is why Alabama, like many other states, has criminalized the conduct charged in this indictment.[8] Thus, the question of whether Justin Wayne Matthews should be subject to criminal sanctions for his actions is not the issue confronting this court.[9]

Rather, the fundamental question raised by defendant's motion is whether Congress exceeded its powers under the Commerce Clause of the United States Constitution when enacting statutes which, when applied to facts such as those presented here, make the simple *intra*-state production and possession of visual depictions of a minor engaging in sexually explicit conduct a federal offense, even though those images were not mailed, shipped, or trans-

---

In or about July 2002, within the Northern District of Alabama, the defendant, JUSTIN WAYNE MATTHEWS, did employ, use, persuade, induce, and entice a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, said visual depiction which was produced using materials that had been mailed, shipped, and transported in interstate and foreign commerce, in violation of Title 18, United States Code, Section 2251(a).

Doc. no. 1, at 1. In like manner, Count Two of the indictment charges, in pertinent part, that:

On or about the 30th day of October, 2002, within the Northern District of Alabama, the defendant, JUSTIN WAYNE MATTHEWS, did knowingly possess material that contained images of child pornography, as defined in Title 18, United States Code, Section 2256(8)(A) and (C), that had been mailed, shipped, and transported in interstate and foreign commerce and that was produced using materials that had been mailed, shipped and transported in interstate and foreign commerce, in violation of Title 18, United States Code, Section 2252A(a)(5)(B).

Doc. no. 1, at 1–2. It probably should be noted that defendant "introduced" himself to the minor depicted in the tape recording during computer-generated "conversations" that occurred in electronic "chat rooms" hosted by an internet service provider known as America Online ("AOL"). *See, e.g.,* Tr. at 19–20. By means of such computer-generated blandishments, as well as some subsequent telephone conversations, *id.* at 25, 27–28, defendant enticed and persuaded the young woman to meet him at various times and places for the purpose of engaging in sexual relations. The parties stipulated that AOL communications originating in Alabama are transmitted to Virginia, and from Virginia to the ultimate recipient, even if the ultimate

recipient resides in Alabama. Tr. at 41. Even so, the government did *not* charge defendant with a violation of 18 U.S.C. § 2422, which provides, in part:

Whoever, *using* the mail or *any facility or means of interstate or foreign commerce,* . . . knowingly *persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in* prostitution or *any sexual activity for which any person can be charged with a criminal offense,* or attempts to do so, shall be fined under this title, imprisoned not more than 15 years, or both.

18 U.S.C. § 2422(b) (emphasis supplied).

8. *See generally* "The Alabama Child Pornography Act," codified at Alabama Code § 13A–12–190 *et seq.* (1975) (1994 Replacement Vol.). Section 13A–12–191, for example, makes it a "Class B" felony for any person to produce, possess, display, or distribute any materials containing a visual depiction of a person under the age of seventeen years engaged in any act of sado-masochistic abuse, sexual intercourse, sexual excitement, masturbation, breast or genital nudity, or "other sexual conduct." Class B felonies are punishable by not less than two, nor more than twenty, years of imprisonment, § 13A–5–6(a)(2), and a fine of not more than $10,000, § 13A–5–11(a)(2).

9. In view of the testimony elicited from two other minors called by the government to testify at the evidentiary hearing about "relevant conduct" under U.S.S.G. § 1B1.3, to the effect that each was under the age of sixteen years on the date sexual relations with defendant occurred, it was (and still is) possible for defendant to be prosecuted by the State of Alabama for Rape in the second degree ("statutory rape") under Ala.Code § 13A–6–62(a)(1), which also is a "Class B" felony.

ported in interstate or foreign commerce by any means, including by computer, and there is no evidence that the visual depictions were intended for interstate distribution or economic activity of any kind, including exchange of the pornographic tape recording for other prohibited materials.

## A. Count One & 18 U.S.C. § 2251(a)

Count One of the indictment is based upon 18 U.S.C. § 2251(a),[10] which provides that:

> Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, shall be punished as provided under subsection (d), if such person knows or has reason to know that such visual depiction will be transported in interstate or foreign commerce or mailed, [or] if that visual depiction was produced using materials that have been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported in interstate or foreign commerce or mailed.

*Id.* (emphasis supplied to reflect relevant portions of the conduct charged in Count One).

A "minor" is defined by 18 U.S.C. § 2256(1) as "any person under the age of eighteen years," while the term "visual depiction" includes "undeveloped film and videotape." 18 U.S.C. § 2256(5). The phrase "sexually explicit conduct" is de-fined by 18 U.S.C. § 2256(2) as meaning, among other things, "sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, . . . [and] masturbation. . . ."

## B. Count Two & 18 U.S.C. § 2252A(a)(5)(B)

Count Two of the indictment is based upon 18 U.S.C. § 2252A(a)(5)(B),[11] which makes it a federal offense for any person to

> *knowingly possess* [ ] any book, magazine, periodical, film, *videotape,* computer disk, or any other material *that contains an image of child pornography that* has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer, or that *was produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce by any means,* including by computer.

*Id.* (emphasis supplied to reflect relevant portions of the conduct charged in Count Two).

The term "child pornography" is defined by 18 U.S.C. § 2256(8)(A) as meaning

> any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where—
>
> > (A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct. . . .

## C. The Protection of Children Against Sexual Exploitation Act of 1977

The statutes upon which the charged offenses are based were enacted as part of

---

**10.** *See supra* note 7.

**11.** *See supra* note 7.

the Protection of Children Against Sexual Exploitation Act of 1977 ("1977 Act"), Pub.L. No. 95–225, 92 Stat. 7 (1978), 18 U.S.C. § 2251 *et seq.* The 1977 Act is a comprehensive scheme that prohibits the production, receipt, possession, transmission, and sale of child pornography.

During the process of enacting the 1977 Act, the Department of Justice expressed concern that the legislation was "jurisdictionally deficient." *See* S.Rep. No. 95–438 at 25 (DOJ response to request of Senate Judiciary Committee for Department's view of the proposed legislation), *reprinted in* 1978 U.S.C.C.A.N. 40, 60, *also available at* 1977 WL 9660. Writing on behalf of the Department, then-Assistant Attorney General Patricia M. Wald stated:

> [T]he bill would cover a purely intrastate photographing and distribution operation on the theory that commerce is "affected" in that the processing of the film or photographs utilize materials that moved in interstate commerce.... *In our opinion, the investigation or prosecution of purely local acts of child abuse should be left to local authorities with federal involvement confined to those instances in which the mails or facilities of interstate commerce are actually used or intended to be used for distribution of the film or photographs in question.*

S.Rep. No. 95–438 at 26, 1978 U.S.C.C.A.N. at 61 (emphasis supplied).

█ As originally enacted, the provisions now codified in 18 U.S.C. §§ 2251 and 2252 included a requirement that visual depictions of child pornography actually move (or proof that they were intended for movement) in interstate or foreign commerce. The relevant portions of the original version of the 1977 Act read as follows:

**Section 2251. 18 U.S.C. 2251. Sexual exploitation of children.**

(a) Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, any sexually explicit conduct for the purpose of producing any visual or print medium depicting such conduct, shall be punished as provided under subsection (c), *if such person knows* or has reason to know *that such visual or print medium will be transported in interstate or foreign commerce or mailed, or if such visual or print medium has actually been transported in interstate or foreign commerce or mailed.*

. . .

**Section 2252. 18 U.S.C. 2252. Certain activities relating to material involving the sexual exploitation of minors.**

(a) Any person who—,

(1) *knowingly transports or ships in interstate or foreign commerce* or mails, *for the purpose of sale or distribution for sale,* any obscene visual or print medium, if—,

(A) the producing of such visual or print medium involves the use of a minor engaging in sexually explicit conduct; and

(B) such visual or print medium depicts such conduct; or

(2) *knowingly receives for the purpose of sale or distribution for sale,* or knowingly sells or distributes for sale, *any obscene visual or print medium that has been transported or shipped in interstate or foreign commerce or mailed,* if—,

(A) the producing of such visual or print medium involves the use of a minor engaging in sexually explicit conduct; and

(B) such visual or print medium depicts such conduct;

shall be punished as provided in subsection (b) of this section. Pub.L. No. 95–225, § 2(a), 92 Stat. 7, 7–8 (1978) (emphasis supplied).

### 1. 1984 amendments

The 1977 Act was amended by the Child Protection Act of 1984. The amendments were prompted by the Supreme Court's decision in *New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982), which upheld the constitutionality of a New York statute, and found that the state's interest in protecting children outweighed a need for protection of child pornography under the First Amendment. *See* Child Protection Act of 1984, Pub.L. No. 98–292, 98 Stat. 204; *see also* H.R. Rep. 98–536, at 1–2, *reprinted in* 1984 U.S.C.C.A.N. 492, 492–93, *available at* 1983 WL 25391.[12] The 1984 amendments sought to eliminate the requirements of the 1977 Act to prove "obscenity" and "commercial purpose," as well as to raise the age of protection of children under the Act from sixteen to eighteen years. *See* H.R. Rep. 98–536, at 5, *reprinted in* 1984 U.S.C.C.A.N. 492, at 496.

### 2. 1988 amendments

The Child Protection and Obscenity Enforcement Act of 1988 further amended the 1977 Act by providing that the movement of child pornography prohibited by the statute encompassed movement accomplished "by any means including by computer." Pub.L. No. 100–690, § 7511(b), 102 Stat. 4485, 4485 (1998).[13]

### 3. 1990 amendments

Two years later, 18 U.S.C. § 2252 was amended as part of the Child Protection Restoration and Penalties Enhancement Act of 1990, to include child pornography that contained "materials" that had moved in interstate or foreign commerce. Pub.L. No. 101–647, § 323(b), 104 Stat. 4816, 4819.

### 4. 1998 amendments

Congress again amended the 1977 Act in 1998, expanding the jurisdictional basis of 18 U.S.C. § 2251, and encompassing *materials used in the production of visual depictions* that had "been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer." Pub.L. No. 105–314, § 201(a), 112 Stat. 2974, 2977 (1998) (codified at 18 U.S.C. § 2251(a)). This amendment brought § 2251 in line with analogous possession statutes—*i.e.,* 18 U.S.C. §§ 2252(a)(4)(B), 2252A(a)(4)(B), and 2252A(a)(5)(B)—which contained equivalent jurisdictional language. The amendment also extended the coverage of the statute to cases in which proof of the interstate transportation of visual depictions, or proof of the pornographer's knowledge as to interstate transportation, is absent. *See* H.R. Rep. 105–557, at 26–27 (1998), *reprinted at* 1998 WL 285821.

### D. Congressional Power to Regulate *Intra*-state Acts

 Congress can regulate three broad categories of activity pursuant to its powers under the Commerce Clause:[14] (1) the

---

**12.** Congress noted that very few prosecutions had occurred since enactment, and the 1977 Act consequently required "some modification." H.R. Rep. 98–536, at 2, *reprinted in* 1984 U.S.C.C.A.N. 492, 493, *available at* 1983 WL 25391.

**13.** The Child Protection and Obscenity Enforcement Act of 1988 was enacted as part of

the Anti–Drug Abuse Act of 1988, Pub.L. No. 100–690, § 1, 102 Stat. 4181, 4181. *See generally* Bradley Scott Shannon, *The Jurisdictional Limits of Federal Criminal Child Pornography Law,* 21 U. Haw. L.Rev. 73 (1999).

**14.** The Constitution delegates to Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and

channels of interstate commerce;[15] (2) the instrumentalities of interstate commerce;[16] and (3) those *intra*-state activities having a "substantial" relation to interstate commerce. *United States v. Lopez,* 514 U.S. 549, 558–59, 115 S.Ct. 1624, 1629–30, 131 L.Ed.2d 626 (1995). Given the facts and stipulations presented in this case, the parties have correctly focused their arguments upon the third category.[17] *See, e.g., United States v. McCoy,* 323 F.3d 1114, 1118 (9th Cir.2003) (analyzing § 2252(a)(4)(B) under category three); *United States v. Kallestad,* 236 F.3d 225, 228–31 (5th Cir.2000) (same); *United States v. Angle,* 234 F.3d 326, 337 n. 12 (7th Cir.2000) (same).

As the Eleventh Circuit observed in *United States v. Ballinger,* 312 F.3d 1264 (11th Cir.2002), while the Constitution permits Congress to regulate

> *any* instrumentality or channel of interstate commerce, the Constitution permits Congress to regulate only those intrastate activities which have a *substantial* effect on interstate commerce, and such regulation of purely intrastate activity reaches the outer limits of Congress' commerce power.
>
> To hold otherwise ... would "convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Lopez,* 514 U.S. at 567, 115 S.Ct. 1624, 131

L.Ed.2d 626. This the Constitution does not permit. *Id.; see also Maryland v. Wirtz,* 392 U.S. 183, 197, n. 27, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968) (the Constitution does not permit Congress to use a relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities).

*Ballinger,* 312 F.3d at 1270 (emphasis in original) (holding that federal church arson act did not apply to purely *intra*-state arson with no substantial effect on interstate commerce).

**1. The *Morrison* test for determining whether an activity has a "substantial relation" to interstate commerce**

The Supreme Court established what is now the controlling test for determining whether an *intra*-state activity *substantially* affects interstate commerce in *United States v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000): *i.e.,* (1) whether the regulatory statute enacted by Congress implicates activities that have something to do with "commerce," or any sort of economic enterprise, however broadly one might define those terms; (2) whether the statute contains an "express jurisdictional element which might limit its reach" to *intra*-state activities having "an explicit connection with or effect on interstate commerce"; (3) wheth-

---

with the Indian Tribes." U.S. Const., art. I, § 8, cl. 3.

**15.** "The channels of interstate commerce include interstate highways, shipping lanes, rivers, lakes, canals, railroad track systems, the mail, telegraph lines, air traffic routes electronic and all other *modes of interstate or foreign movement* of commerce." *United States v. Ballinger,* 312 F.3d 1264, 1269 (11th Cir.2002) (emphasis in original) (citation omitted).

**16.** "The instrumentalities of interstate commerce are those '*persons or things*' that *move*

in interstate commerce, including all cars and trucks, ships, aircraft and anything else that travels across state lines, as do interstate shipments." *Id.* (emphasis in original) (citation omitted).

**17.** *See* Defendant's Motion to Dismiss (doc. no. 27); Government's Response to Defendant's Motion to Dismiss (doc. no. 29); Defendant's Motion to Reconsider the Court's Order for Motion to Dismiss (doc. no. 41); Government's Response to Defendant's Motion to Reconsider the Court's Order for Motion to Dismiss (doc. no. 46).

er congressional findings in the statute or its legislative history support the conclusion that the *intra*-state activity in question has a *substantial* effect on interstate commerce; and (4) whether the link between the *intra*-state activity and its effect on interstate commerce is "attenuated." *Id.* at 610–13, 120 S.Ct. at 1749–51. Each of these factors is examined below.

### a. Whether the statute relates to an activity that has something to do with "commerce," or any sort of economic enterprise

In *Morrison,* the Supreme Court found that Congress exceeded its Commerce Clause power when enacting a provision of the Violence Against Women Act of 1994, 42 U.S.C. § 13981, which provided a federal civil remedy for victims of gender-motivated violence. In so holding, the Court rejected "the argument that Congress may regulate *noneconomic, violent criminal conduct* based solely on that conduct's *aggregate effect* on interstate commerce. *The Constitution requires a distinction between what is truly national and what is truly local." Morrison,* 529 U.S. at 617–18, 120 S.Ct. at 1754 (citing *Lopez,* 514 U.S. at 567–68, 115 S.Ct. at 1634) (emphasis supplied).

Although some, if not most, child pornography may certainly be the product of commercial enterprise, it does not follow that *all* child pornography is the product of, or intended for distribution in, a market pandering to other perverts. The exploitation of a minor in home-produced video recordings of sexual acts is, unquestionably, despicable; but when it is done with no intention to sell, distribute, or exchange the tapes thus produced it is not "commerce."

■ Further, the mere possession of an object is not "commerce." *See United States v. Kallestad,* 236 F.3d 225, 231 (5th Cir.2000) (Jolly, J., dissenting) ("I can think of no activity less commercial than the simple local possession of a good produced for personal use only."). If mere possession of a prohibited object rendered activity "commercial" in character, and thereby subject to congressional regulation under the Commerce Clause, then the *Lopez* decision would have been different. In *Lopez,* the Supreme Court rejected the government's contention that possession of a gun in a local school zone is an economic activity that might, through repetition elsewhere, substantially affect interstate commerce. *See* 514 U.S. at 563–67, 115 S.Ct. at 1632–34.

### (i) The aggregation theory of *Wickard v. Filburn*

The government relies upon *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), as support for the statutes on which the indictment is based. In *Wickard,* an Ohio farmer named Roscoe Filburn challenged the constitutionality of the Agricultural Adjustment Act of 1938, which imposed penalties on farmers who produced agricultural commodities in excess of marketing quotas established for their farms by the Secretary of Agriculture. The economic theory undergirding the Act was the so-called "law" of supply and demand, which explains how the price of goods or commodities sold in an open market is determined by the variables of supply and demand. In general, the price of goods tend to rise when the quantity demanded exceeds the quantity supplied; conversely, prices tend to fall when the quantity supplied exceeds the quantity demanded. The purpose of the regulatory scheme embodied in the 1938 Act was that of controlling the volume (*supply* ) of agricultural commodities placed into the streams of national and foreign commerce, thereby supporting the *prices* paid to producers.

The general scheme of the Agricultural Adjustment Act of 1938 as related to

wheat is to control the volume moving in interstate and foreign commerce in order to avoid surpluses and shortages and the consequent abnormally low or high wheat prices and obstructions to commerce. Within prescribed limits and by prescribed standards the Secretary of Agriculture is directed to ascertain and proclaim each year a national acreage allotment for the next crop of wheat, which is then apportioned to the states and their counties, and is eventually broken up into allotments for individual farms.

*Id.* at 115, 63 S.Ct. at 84 (emphasis supplied) (footnotes omitted).

Filburn, who owned and operated a small Ohio farm on which he maintained a herd of dairy cattle (selling milk) and a flock of chickens (selling poultry and eggs) violated the Act in the following respects:

It ha[d] been his practice to raise a small acreage of winter wheat, sown in the Fall and harvested in the following July; to sell a portion of the crop; to feed part to poultry and livestock on the farm, some of which is sold; to use some in making flour for home consumption; and to keep the rest for the following seeding. . . .

In July of 1940, pursuant to the Agricultural Adjustment Act of 1938, as then amended, there were established for [Filburn's] 1941 crop a wheat acreage allotment of 11.1 acres and a normal yield of 20.1 bushels of wheat an acre. He was given notice of such allotment in July of 1940 before the Fall planting of his 1941 crop of wheat, and again in July of 1941, before it was harvested. He sowed, however, 23 acres, and harvested from his 11.9 acres of excess acreage 239 bushels, which under the terms of the Act as amended on May 26, 1941, constituted farm marketing excess, subject to

a penalty of 49 cents a bushel, or $117.11 in all.

*Id.* at 114–15, 63 S.Ct. at 84.

Filburn argued that Congress exceeded its powers under the Commerce Clause when enacting a statute that regulated commodities produced wholly within one state for the personal use and consumption of the producer, and not for sale in interstate or foreign markets. In rejecting Filburn's argument, the Supreme Court explained:

The effect of consumption of home-grown wheat on interstate commerce is due to the fact that it constitutes the most variable factor in the disappearance of the wheat crop. Consumption on the farm where grown appears to vary in an amount greater than 20 per cent of average production. The total amount of wheat consumed as food varies but relatively little, and use as seed is relatively constant.

The maintenance by government regulation of a price for wheat undoubtedly can be accomplished as effectively by sustaining or increasing the demand as by limiting the supply. The effect of the statute before us is to restrict the amount which may be produced for market and the extent as well to which one may forestall resort to the market by producing to meet his own needs. *That [Filburn's] own contribution to the demand for wheat may be trivial by itself is not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial.*

It is well established by decisions of this Court that the power to regulate commerce includes the power to regulate the prices at which commodities in that commerce are dealt in and practices affecting such prices. One of the pri-

mary purposes of the Act in question was to increase the market price of wheat and to that end to limit the volume thereof that could affect the market. It can hardly be denied that a factor of such volume and variability as home-consumed wheat would have a substantial influence on price and market conditions. This may arise because being in marketable condition such wheat overhangs the market and if induced by rising prices tends to flow into the market and check price increases. But if we assume that it is never marketed, it supplies a need of the man who grew it which would otherwise be reflected by purchases in the open market. Home-grown wheat in this sense competes with wheat in commerce . . . .

317 U.S. at 127–28, 63 S.Ct. at 90–91 (citations and footnote omitted) (emphasis supplied).

Unlike *Wickard,* there is no evidence in the case before this court suggesting that defendant's home-production and possession of the video recording that is the basis for indictment had any plausible impact on the supply, demand, or price of child pornography in the national "market" for such perversions. There is no evidence that defendant sold, distributed, or exchanged copies of his recording to anyone, in or out of the State of Alabama, or that he intended to do so. Consequently, his *intra*-state production and possession of the recording cannot be described as "commerce" under any construction of that term. It follows, therefore, that *Wickard's* aggregation analysis does not apply.

In both *Lopez* and *Morrison,* the Supreme Court carefully limited the precedential reach of the *Wickard* decision. The *Lopez* Court held that "a criminal statute that by its terms has nothing to do with '*commerce*' or any sort of *economic enterprise,* however broadly one might define those terms," cannot be sustained by that line of cases flowing from *Wickard* which "uphold[s] regulations of [intrastate] activities that arise out of or are connected with a commercial transaction, [and] which[, when] viewed in the aggregate, substantially affects interstate commerce." 514 U.S. at 561, 115 S.Ct. at 1630–31 (emphasis supplied); *see also id.* at 560, 115 S.Ct. at 1630 ("Where [intrastate] economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained.").

Moreover, the *Morrison* Court clearly stated that, "in every case where we have sustained federal regulation [of intra-state activity] under the aggregation principle in *Wickard,* . . . the regulated activity was of an apparent *commercial* character." 529 U.S. at 611 n. 4, 120 S.Ct. at 1750 n. 4 (citation omitted) (emphasis supplied).

### (ii) *United States v. Rodia*

When *Wickard's* aggregation analysis is laid aside, the government falls back upon the Third Circuit's opinion in *United States v. Rodia,* 194 F.3d 465 (3d Cir. 1999). In that case, which pre-dates *Morrison,* the Third Circuit upheld a Commerce Clause challenge to § 2252(a)(4)(B), even while conceding that the language contained in the 1990 amendments to the Protection of Children Against Sexual Exploitation Act of 1977 (and at issue in that case) was not supported by congressional findings. 194 F.3d at 474. The *Rodia* court rationalized that Congress "could have" concluded—although, in fact, it had not done so—that the intra-state possession of home-made pornography "may well stimulate a further interest in pornography that immediately or eventually animates demand for interstate pornography." 194 F.3d at 477.

This court is reluctant to engage in such fictionalization of congressional intent in order to reach the result that intra-state possession of home-made child pornogra-

phy is "economic activity." Indeed, after *Morrison*, the analysis in *Rodia* falls short, because only speculation and conjecture support the conclusion that home-made child pornography is "commercial" or "economic" in nature. *See United States v. McCoy*, 323 F.3d 1114, 1121 (9th Cir.2003).

b. **Whether the statute contains an "express jurisdictional element which might limit its reach" to activities having "an explicit connection with or effect on interstate commerce"**

Prior to *Morrison*, the "jurisdictional hook" of 18 U.S.C. §§ 2251(a) and 2252A(a)(5)(B) had been viewed by some courts as sufficient to render those statutes constitutional.[18] The Third Circuit, however, expressed doubt that the jurisdictional provision in an analogous statute, § 2252(a)(4)(B), added any substance to a Commerce Clause analysis. *See United States v. Rodia*, 194 F.3d at 472–73.

> As a practical matter, the limiting jurisdictional factor is almost useless here, since all but the most self-sufficient child pornographers will rely on film, cameras, or chemicals that traveled in interstate commerce and will therefore fall within the sweep of the statute. At all events, it is at least doubtful in this case that the jurisdictional element adequately performs the function of guaranteeing that the final product regulated substantially affects interstate commerce.

*Id.* at 473.

Following the Supreme Court's decision in *Morrison*, other circuits have similarly questioned the efficacy of the "jurisdictional hook" at issue here. *See United States v. Holston*, 343 F.3d 83, 89 (2d Cir.2003);

*United States v. McCoy*, 323 F.3d 1114, 1125–26 (9th Cir.2003); *United States v. Corp*, 236 F.3d 325, 331 (6th Cir.2001); *United States v. Angle*, 234 F.3d 326, 337 (7th Cir.2000). *But see United States v. Kallestad*, 236 F.3d 225, 229 (5th Cir.2000).

In the present case, the "jurisdictional hook" attaches—if it grips at all—to the fact that the video camera and tape had moved in foreign and interstate commerce prior to the date on which those objects were used to record the visual depictions of defendant and a minor engaging in sexual acts. This so-called "limiting" jurisdictional provision is, as the Third Circuit pronounced, for all practical purposes useless, because it utterly fails to guarantee "that the final product regulated [the pornographic *images* recorded on the tape] substantially affects interstate commerce." *Rodia*, 194 F.3d at 472. This court therefore agrees with the majority of the circuit courts of appeals cited above, which are aligned in their doubt as to the effectiveness of the jurisdictional language contained in the statutes at issue here.

c. **Whether congressional findings in the statutes upon which the contested prosecution is based, or their legislative history, support the judgment that the charged conduct has a substantial effect on interstate commerce**

Congress undisputedly declared commercial child pornography to be a national evil when enacting the Protection of Children Against Sexual Exploitation Act of 1977 by such findings as these:

> —[C]hild pornography and child prostitution have become highly organized,

---

**18.** The court looked at analogous cases analyzing various sections of the Protection of Children Against Sexual Exploitation Act of 1977, as amended, containing the same jurisdictional language. *See, e.g., United States v. Bausch*, 140 F.3d 739, 741 (8th Cir.1998)

(stating that § 2252(a)(4)(B) ensures that each defendant's pornography possession affected interstate commerce on a case-by-case basis); *United States v. Robinson*, 137 F.3d 652, 656 (1st Cir.1998) (same).

multimillion dollar industries that operate on a nationwide scale;

—[T]he use of children as prostitutes or as the subjects of pornographic materials is very harmful to both the children and the society as a whole;

—[S]uch prostitution and the sale and distribution of such pornographic materials are carried on to a substantial extent through the mails and other instrumentalities of interstate and foreign commerce; and

—[E]xisting federal laws dealing with prostitution and pornography do not protect against the use of children in these activities and ... specific legislation in this area is both advisable and needed.

*See* S.Rep. No. 95–438, at 5 (1978), *reprinted in* 1978 U.S.C.C.A.N. 40, 42–43. Congress expressly stated its concern that the child pornography "industry" operated on a "nationwide scale," with sale and distribution occurring "to a substantial extent through the mails and other instrumentalities of interstate and foreign commerce." *Id.* For such reasons, the contested statutes survive a facial challenge.

The mere existence of such legislative findings, however, "is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation" *as applied* to the facts presented here. *Morrison,* 529 U.S. at 614, 120 S.Ct. at 1752. It is incumbent upon the judiciary to ultimately answer the question whether "particular [intra-state] operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them." *Id.* (quoting *Lopez,* 514 U.S. at 557 n. 2, 115 S.Ct. at 1629 n. 2) (in turn quoting *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 273, 85 S.Ct.

348, 13 L.Ed.2d 258 (1964) (Black, J., concurring)).

As applied to defendant Matthews, the statutes at issue exceed congressional authority under the Commerce Clause. Prosecution of the defendant in no way addresses the concerns expressed by Congress when enacting §§ 2251 and 2252A(a)(5)(B). It has been stipulated that no actual images of the child pornography recorded on the video tape forming the basis for each count of the indictment were mailed, shipped, or transported in interstate or foreign commerce. Moreover, there is no evidence indicating that defendant *intended* to sell, distribute, or exchange the video tape in any market: state, national, or foreign. To the contrary, the fact that the tape was seized in defendant's bedroom during execution of a state search warrant on October 30, 2002, *some three to four months after the recorded events,* indicates that defendant retained possession of the tape with no intention to sell, distribute, or exchange it within the national pornography industry that was of concern to Congress.[19] No legislative findings exist with respect to the interstate effects of the strictly intrastate, non-commercial, production and possession of the video tape at issue here. As such, the court cannot find that the intrastate conduct for which defendant has been prosecuted had a "substantial" effect on interstate commerce, based upon legislative history or congressional pronouncements.

**d. Whether the link between the charged conduct and its effect on interstate commerce is attenuated**

As previously observed, the aggregation principle enunciated in *Wickard v. Filburn* does not assist the government in creating

---

**19.** *See generally* doc. no. 58 (transcript of evidentiary hearing held Sept. 5, 2003), at 5–26.

a link, "substantial" or otherwise, between the charged conduct and its effect on interstate commerce. "No aggregation of local effects is permissible to elevate a non-economic [intra-state] activity's insubstantial effect on interstate commerce into a substantial one in order to support federal jurisdiction." *United States v. Ballinger*, 312 F.3d 1264, 1270 (11th Cir.2002). While the exploitation of a minor in home-made child pornography is detestable, and deserving of strong criminal condemnation, it is not "commerce" or "economic activity" subject to congressional regulation in the absence of any evidence indicating that the pornographer intended to mail, sell, distribute, or exchange the images within an interstate market.

> To allow Congress to regulate local crime on a theory of its aggregate effect on the national economy would give Congress a free hand to regulate any activity, since, in the modern world, virtually all crimes have at least some attenuated impact on the national economy. [ ] Furthermore, it would transfer to Congress a general police power that the Constitution denies the federal government and reposes in the states.

*Ballinger*, 312 F.3d at 1271 (citing *United States v. Morrison*, 529 U.S. at 615, 618, 120 S.Ct. at 1752–53, 1754).

The State of Alabama makes it a crime to engage in the acts charged in this federal indictment.[20] "When Congress criminalizes conduct already denounced as criminal by the States, it affects a change in the sensitive relation between federal and state criminal jurisdiction." *Lopez*, 514 U.S. at 561 n. 3, 115 S.Ct. at 1631 n. 3. The tension between state and federal jurisdic-

tion over this matter is only exacerbated when one considers that the federal statute defines "minor" as "any person under the age of eighteen years,"[21] while the Alabama Code extends criminal liability when the depicted minor is "a person under the age of 17 years."[22]

If Congress can regulate the making and possession of child pornography under the facts presented in this case, then there is nothing outside the purview of congressional regulation, "even in areas such as criminal law enforcement or education where States historically have been sovereign." *Lopez*, 514 U.S. at 564, 115 S.Ct. at 1632. Despite Congress's admirable goal of stamping out the reprehensible activity surrounding the creation of child pornography, the court is mindful of its "duty to recognize meaningful limits on the commerce power of Congress." *Lopez*, 514 U.S. at 580, 115 S.Ct. at 1640 (Kennedy, J., concurring). As applied to the facts presented here, the prosecution of defendant under §§ 2251(a) and 2252A(a)(5)(B) cannot withstand scrutiny.

### E. Post-*Morrison* Cases

Prior to *Morrison*, the circuit courts of appeals were aligned in upholding the constitutionality of the federal child pornography statutes. *See United States v. Rodia*, 194 F.3d 465, 476 (3d Cir.1999) (§ 2254(a)(4)(B)); *United States v. Robinson*, 137 F.3d 652, 656 (1st Cir.1998) (§ 2254(a)(4)(B)). Since the *Morrison* decision, the circuit courts of appeals are divided on the issue presented, with the Eleventh Circuit yet to weigh in. *Compare United States v. Holston*, 343 F.3d 83

---

**20.** *See supra* note 8. *See also supra* note 9 (other state crimes that could be charged, based upon defendant's acts with two other juvenile females).

**21.** 18 U.S.C. § 2256(1) (2003). The term "minor" was originally defined to mean "any

individual who has not attained age sixteen." As observed in Part III.C.1 *supra*, however, this provision was amended in 1984, extending protection of minors up to eighteen years of age.

**22.** Ala.Code § 13A–12–191 *et seq.*

(2d Cir.2003) (upholding § 2251(a) on both facial and as-applied challenges lodged by defendant who made several video tapes depicting himself engaged in sexually explicit acts with two minors); *United States v. Buculei,* 262 F.3d 322 (4th Cir.2001) (upholding § 2251(a) on an as-applied challenge); *United States v. Hoggard,* 254 F.3d 744, 746 (8th Cir.2001) (same, § 2251); *United States v. Kallestad,* 236 F.3d 225 (5th Cir.2000) (same, § 2254(a)(4)(B)); *United States v. Angle,* 234 F.3d 326, 338 (7th Cir.2000), *cert. denied,* 533 U.S. 932, 121 S.Ct. 2556, 150 L.Ed.2d 722 (2001), *appeal after remand,* 315 F.3d 810 (7th Cir.2003) (§ 2254(a)(4)(B)) *with United States v. McCoy,* 323 F.3d 1114, 1122–23 (9th Cir. 2003) (finding § 2252(a)(4)(B) unconstitutional as applied to defendant's "intrastate possession of home-grown child pornography not intended for distribution or exchange"); *United States v. Corp,* 236 F.3d 325 (6th Cir.2001) (finding § 2252(a)(4)(B) unconstitutional as applied where defendant was not involved in the distribution of the pictures in question or sharing them with others, and his act of photographing minor engaging in sexual activity was purely intrastate and consensual).

In *United States v. McCoy,* 323 F.3d 1114 (9th Cir.2003), the Ninth Circuit held that 18 U.S.C. § 2252(a)(4)(B)—which criminalizes the possession of visual depictions of a minor engaging in sexually explicit conduct, when the images were produced using materials that had been mailed, shipped, or transported in interstate or foreign commerce—was unconstitutional as applied to a mother who possessed a photograph showing herself and her young daughter partially unclothed, with their genital areas exposed. The photograph was intended for home use, and not sale, distribution, or exchange. Nevertheless, as in the case of the video camera and tape used by defendant herein, the photo was made with a camera and film that had traveled in interstate commerce. Section 2252(a)(4)(B) contains a jurisdictional element allowing prosecutions where the pornographic material "was produced using materials which have been mailed or ... shipped or transported" in interstate commerce. 18 U.S.C. § 2252(a)(4)(B).[23] The court found that this language provided "no support for the government's assertion of federal jurisdiction." *McCoy,* 323 F.3d at 1126.

*McCoy* illustrates the principle that, just because some of the elements that go together to compose an object have moved in interstate commerce at some time or another—*e.g.,* the camera used to record a visual image; the film, tape, diskette, or other medium on which the image is recorded; and the photographic paper, television screen, or computer monitor upon which the image is subsequently replicated—it does not follow *ipso facto* that Congress can constitutionally regulate *the object* produced through incorporation of such constituents when the production and possession of the object occur solely within a single state. Instead, *the intra-state object itself* must move in the United States mail, or through use of the channels

---

**23.** The statute makes it illegal for any person to:

knowingly possess 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has shipped or transported in interstate or foreign commerce, *or which was produced using materials which*

*have been mailed or so shipped or transported, by any means including by computer,* if—

(i) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and

(ii) such visual depiction is of such conduct. . . .

18 U.S.C. § 2252(a)(4)(B) (emphasis supplied).

and instrumentalities of interstate or foreign commerce, or be shown to have a "substantial" effect on interstate commercial activities that unquestionably are subject to congressional regulation.

Likewise, in this case, the government would have the court substitute an issue of unquestioned national concern, child pornography, for the constitutional requirement that the government demonstrate that the video tape produced and possessed wholly within one state had a "substantial" effect on interstate commerce. This the court cannot do. In highlighting the difference between intra-state conduct having a "substantial" effect on interstate commerce, and conduct that multiple states have addressed as internal matters, the Ninth Circuit quoted *United States v. Bird*, 124 F.3d 667 (5th Cir.1997), in which the Fifth Circuit observed:

> [S]imply because a type of antisocial conduct (which any state could validly proscribe) can fairly be described as a "national" problem in the sense that many (or even all) states experience more instances of it than are desirable or desired, [does not mean that] this of itself suffices to bring such conduct within the scope of Congress's Commerce Clause power. Plainly it does not. Ever since a time well before the Constitutional Convention, there have been every year in each of the several states more murders than desirable or desired, but it is nevertheless plain that the Commerce Clause does not authorize Congress to enact legislation punishing any and all murders throughout the nation.

*McCoy*, 323 F.3d at 1123 n. 18 (quoting *Bird*, 124 F.3d at 678 n. 13).

The dissent in *McCoy* asserted that as-applied challenges cannot be brought under the Commerce Clause, relying upon a single sentence from *Lopez:* "[W]here a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence." *McCoy*, 323 F.3d at 1134 (citing *Lopez*, 514 U.S. at 558, 115 S.Ct. at 1629). Subsequently, another Ninth Circuit panel explained how the sentence from *Lopez* was taken out of context by the dissenter in *McCoy*, saying that the sentence can only mean that, "where a general regulatory statute governs a large enterprise, it does not matter that its components have a *de minimis* relation to interstate commerce on their own. What does matter is that the components could disrupt the enterprise, and could thus interfere with interstate commerce." *United States v. Stewart*, 348 F.3d 1132, 1141 (9th Cir. 2003). In any event, the Eleventh Circuit has not been so constricted following the Supreme Court's decision in *Lopez*, and has declared on an as-applied challenge that a federal statute exceeded the power of Congress under the Commerce Clause. *See United States v. Ballinger*, 312 F.3d 1264 (11th Cir.2002).

Recently, the Ninth Circuit reaffirmed its holding in *McCoy* in a case involving a Commerce Clause challenge to a machine gun statute. *See United States v. Stewart*, 348 F.3d 1132 (9th Cir.2003). In *Stewart*, the court held that 18 U.S.C. § 922(*o*) was unconstitutional as applied to a defendant who possessed a machine gun that was made from component parts assembled at his home. Judge Kozinski, writing for the court, pointed out that

> [a]t some level, of course, everything we own is composed of something that once traveled in commerce. This cannot mean that *everything* is subject to federal regulation under the Commerce Clause, else that constitutional limitation would be entirely meaningless.

*Id.* at 1135 (emphasis in original). The court analogized Stewart's circumstances

to that of *McCoy,* where "McCoy's photographs, which were intended 'for her own personal use,' did not 'compete with other depictions exchanged, bought or sold in the illicit market for child pornography and did not affect their availability or price.'" *Id.* at 1138. Stewart, crafting his own guns, and working out of his own home, functioned outside the commercial gun market. The court explained that, unlike wheat,

> which is a staple commodity that Filburn would probably have had to buy, had he not grown it himself, there is no reason to think Stewart would ever have bought a machine gun from a commercial source, had he been precluded by law from building one himself.... Thus, the link between Stewart's activity and its effect on interstate commerce is simply too tenuous to justify federal regulation.

*Id.* (footnote omitted). And, so it is here.

The Sixth Circuit has likewise concluded, under analogous facts, that § 2252(a)(4)(B) was unconstitutional as applied to a defendant who was not involved in the distribution of (or sharing with others) the pictures in question. The defendant was engaged in the strictly intra-state act of photographing a minor engaging in consensual sexual activity. *See United States v. Corp,* 236 F.3d 325 (6th Cir.2001).

A number of circuit courts of appeals have affirmed the constitutionality of the federal child pornography statutes after *Morrison.* Most of these cases fall in one of two categories. The first category encompasses cases in which it was established that the defendants either possessed visual depictions of minors engaged in sexually explicit activity with the intent to transport in interstate commerce, or the images actually had moved in interstate commerce. That is, each involved commercial child pornography that had been, or was intended to be, traded in the illicit interstate market Congress sought to reach. *See United States v. Adams,* 343 F.3d 1024 (9th Cir.2003) (upholding statute against facial challenge where defendant downloaded commercial child pornography from the internet); *United States v. Buculei,* 262 F.3d 322, 330 (4th Cir.2001) (upholding § 2251(a) under as-applied challenge where defendant intended to transport visual depictions in interstate commerce from Maryland to New York); *United States v. Angle,* 234 F.3d 326, 329–30 (7th Cir.2000) (Indiana defendant ordered child pornography video tapes from Colorado vendor).

The second category comprises those cases in which courts have upheld constitutional challenges merely by relying on pre-*Morrison* precedent. *See, e.g., United States v. Hoggard,* 254 F.3d 744, 746 (8th Cir.2001) ("[T]his panel is bound by the reasoning in [*United States v. Bausch,* 140 F.3d 739 (8th Cir.1998) ].").

The exceptions are *United States v. Holston,* 343 F.3d 83 (2d Cir.2003) (upholding § 2251(a) on both facial and as-applied challenges made by defendant who made several videotapes depicting himself engaged in sexually explicit acts with two minor girls), and *United States v. Kallestad,* 236 F.3d 225 (5th Cir.2000) (no evidence demonstrating that defendant's pictures moved in interstate commerce, merely that the film did). In *Holston,* the court found no significance to the fact that defendant neither shipped the materials interstate, nor intended to benefit commercially from his conduct. 343 F.3d at 91. The *Holston* court, however, did note the holdings in *McCoy* and *Corp* as based on "somewhat unique facts." *Id.* at 88 n. 2.

In *Kallestad,* defendant was convicted of violating 18 U.S.C. § 2252(a)(4)(B) after agents found a large number of nude photos and films of women, some of whom

were minors, in defendant's home. 236 F.3d at 226. Defendant had advertised in the Austin, Texas *American Statesman* newspaper for the models, and the photographs were made in defendant's Austin home. *Id.* The film on which the photographic images were recorded was manufactured in some state other than Texas. *Id.* The *Kallestad* majority expanded *Wickard's* scope and gave insufficient weight to the *Morrison* factors. *See McCoy*, 323 F.3d at 1130. Rather than first asking whether the intra-state activity at issue was "economic" in nature and, if so, then applying *Wickard* to determine whether its effect on interstate commerce was "substantial," the *Kallestad* majority used *Wickard* to support its conclusion that the regulated activity was economic (*i.e.*, put the proverbial cart before the horse). As stated in Judge Jolly's dissent:

> Today, the majority has embraced logic the *Morrison* court eschewed. The majority holds that Congress can indeed regulate non-economic, intrastate criminal conduct (possession of child pornography), simply because "this reach into local intrastate conduct was a necessary incident of a congressional effort to regulate a national market." It so holds, despite the Morrison Court's observation that "thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature."

> The majority never asserts that simple possession of self-generated child pornography is an economic activity. Indeed, simple possession for personal purposes cannot possibly be so classified. Instead, the majority's opinion relies on the fall-back principle of *Wickard v. Filburn* to establish that Congress can reach even non-economic intrastate

activity. The majority undertakes such an application of *Wickard,* even though *Morrison* explicitly reminds us that "in every case where we have sustained federal regulation under *Wickard's* aggregation principle, the regulated activity was of an apparent commercial character." Because I can think of no activity less commercial than the simple local possession of a good produced for personal use only, I believe that section 2252(a)(4) is unconstitutional as applied to Kallestad's conduct.

*Kallestad,* 236 F.3d at 232 (Jolly, J., dissenting) (citations omitted). Judge Jolly's dissent in *Kallestad* is more consistent with the teachings of *Morrison* than the majority's opinion.

### III. CONCLUSION

Upon careful reconsideration of the stipulations, evidence, and briefs, the court concludes that 18 U.S.C. §§ 2251(a) and 2252A(a)(5)(B) are unconstitutional *as applied to* simple *intra*-state production and possession of images of child pornography, or visual depictions of a minor engaging in sexually explicit conduct, when such images and visual depictions were not mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer, nor intended for interstate distribution or economic activity of any kind, including exchange of the pornographic recording for other prohibited material. In reaching that conclusion, this court finds persuasive the rationale of the Ninth Circuit in *United States v. McCoy,*[24] and the unique facts presented in this case analogous to the facts of *McCoy* and *United States v. Corp.*[25] Accordingly, this court reaches a similar conclusion, and holds that 18 U.S.C. §§ 2251(a) and 2252A(a)(5)(B), *as applied* to the facts on

---

**24.** 323 F.3d 1114 (9th Cir.2003).

**25.** 236 F.3d 325 (6th Cir.2001).

which each Count of the indictment is based, exceed the powers of Congress under the Commerce Clause of the United States Constitution.

Defendant's conviction pursuant to plea agreement, therefore, is due to be vacated and the indictment dismissed. An appropriate order will be entered contemporaneously herewith.

### ORDER

Upon reconsideration, and in accordance with the memorandum opinion entered contemporaneously herewith, defendant's motion to dismiss [1] is GRANTED, and the conviction of Justin Wayne Matthews pursuant to plea agreement is vacated, the indictment is dismissed, and defendant is discharged.