[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 03-13639

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 18, 2005
THOMAS  K. KAHN
CLERK

D. C. Docket No. 02-00257-CR-T-23-TGW

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALVIN SMITH,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(March 18, 2005)**

Before TJOFLAT, RONEY and HILL, Circuit Judges.

TJOFLAT, Circuit Judge:

On February 5, 2003, following a jury trial in the United States District

Court for the Middle District of Florida, Alvin Smith was convicted of one count of producing child pornography in violation of 18 U.S.C. § 2251(a)[1] and one count of possessing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B).[2] The court sentenced him to 188 months in prison and 60 months of supervised release. Smith appealed and filed his opening brief on May 4, 2004. On October 1, 2004, in United States v. Maxwell, 386 F.3d 1042 (11th Cir. 2004), this court held that purely intrastate possession of child pornography was not converted "into an activity subject to Commerce Clause regulation" simply because "the disks on which the pornography was ultimately copied traveled, when blank, to Florida from someplace outside of Florida." Id. at 1068. Maxwell necessarily casts doubt on Smith's conviction because the asserted basis for federal jurisdiction over his

---

[1] Section 2251(a) provides:
Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, shall be punished . . . if such person knows or has reason to know that such visual depiction will be transported in interstate or foreign commerce or mailed, if that visual depiction was produced using materials that have been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported in interstate or foreign commerce or mailed.

[2] Section 2252A(a)(5)(B) provides:
Any person who . . . knowingly possesses any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer . . . shall be punished. . . .

offenses is that the film, photo paper, and film processor used to produce the pictures he possessed had traveled in interstate commerce sometime before being used to produce them.

Before determining whether <u>Maxwell</u> controls this case, however, we must first determine whether it is relevant at all in light of another recent decision of this court. In <u>United States v. Levy</u>, 379 F.3d 1241, <u>reh'g en banc denied</u>, 391 F.3d 1327 (11th Cir. 2004), we held that the unexceptional rule that issues not briefed are deemed waived applies even to the exceptional case where the defendant seeks to raise a claim that was squarely foreclosed by our own precedent at the time his opening brief was filed but has since been made viable by an intervening decision. <u>Id.</u> at 1241-42; <u>see</u> <u>also</u> <u>Levy</u>, 391 F.3d at 1336 (Tjoflat, J., dissenting from the denial of rehearing en banc) (observing that it was "certainly understandable" that the defendant did not raise the "waived" claim in his opening brief given that our own precedent "unequivocally rejected the same argument"). Under <u>Levy</u>, <u>Maxwell</u> does not apply unless Smith advanced a <u>Maxwell</u>-type claim in his opening brief. In his supplemental letter memorandum,[3] Smith argues that two of the issues raised in his opening brief fairly encompass the <u>Maxwell</u>

_____

[3] After oral argument, we requested that counsel submit supplemental letter memoranda addressing the extent to which <u>Maxwell</u> and <u>Levy</u> should inform our resolution of this appeal.

3

issue; the Government disagrees. Although Smith's brief is not a model of clarity, in light of the principle that we "liberally read briefs to ascertain the issues raised on appeal," United States v. Starke, 62 F.3d 1374, 1379 (11th Cir. 1995), we conclude that Smith has sufficiently presented the Maxwell issue. Accordingly, Levy does not preclude him from relying on Maxwell, although we will review the issue only for plain error because Smith did not raise it at trial.

In Part I, we briefly recount the facts of this case. In Part II, we address the Levy issue. In Part III, we address Smith's Maxwell claim.

I.

In March 2002, the Tampa Police Department executed a search warrant on the home of the defendant's mother. The search was part of an investigation of the defendant's brother, who lived at the residence and was suspected of possessing and selling drugs. Accordingly, the focus of the warrant was drugs and drug paraphernalia. Upon entering the residence, a narcotics dog alerted the officers to a lockbox that was slightly ajar. One of the officers opened the lockbox and discovered a number of photographs that were pornographic in nature. Some of the pictures depicted what appeared to be "very, very young girls having sex . . . with a male who [was later] identified as the defendant." At trial, the defendant's mother testified that the lockbox belonged to Smith, although he was not living at

4

the residence at the time of the search because he was in prison.

Police later determined that the lockbox contained 1768 pictures. Almost all of the photos were sexually explicit, though many were of persons above the age of eighteen. As part of the investigation, an officer in the department's sex crimes and child abuse unit began visiting local shelters for runaways and asking counselors whether they recognized any of the girls in the pictures. Eventually, the officer was able to locate a girl who was in a number of photos that dated November 1999, at which time the girl was still fourteen years old.[4] She confirmed that the photos were of her, and, from another photo found in the lockbox, she identified Smith as the man who had taken them.

At trial, the girl testified that she was living on the street as a runaway in November 1999 when Smith approached her and her then-seventeen-year-old boyfriend, Dominick. Dominick got into Smith's car, and Smith and Dominick left and returned a few minutes later. Dominick told her that she could make some money if she would allow Smith to take some pictures of her in her underwear, and she agreed to do so. She and Dominick then got back into Smith's car and went with him to a house where he retrieved a camera and some film. The three of

---

[4] The Government introduced a proof sheet containing twenty-six thumbnails of the girl and a number of the photos depicted on the sheet. The Government also introduced a birth certificate from the victim's native Mexico that gave her date of birth as March 12, 1985.

them then went to a hotel, and Smith went inside and paid for a room. Only Smith and the girl actually went into the room; Dominick stayed outside.

Once inside the room, Smith told the girl to take off all of her clothes. Although Dominick had told her that she would not have to take off her underwear, she did as Smith instructed. Smith then began taking pictures; he instructed her how to pose a number of times and even physically spread her genitalia himself for a particularly graphic shot. Afterward, he gave her $60 or $70 and left, and she and Dominick spent the night in the room.

In addition to the testimony of the witness and several of the officers involved in the investigation, the Government introduced a recording of a phone conversation between Smith and his mother. Smith placed the call while incarcerated at the Hillsborough County Jail in June 2002. At one point in the conversation, he complained, "I mean, there is no law against havin' no pictures, and there is no law against takin' no pictures. But they tryin' to make it seem like I went out and took pictures of a fourteen year old girl and I knew it." Another part of the conversation went as follows:

LUCILLE SMITH: A person should be able to take pictures or whatever if they want to.
ALVIN SMITH: Yeah. It ain't like I went out, just . . . went out and and and kidnapped somebody and took it. . . .
LUCILLE SMITH: And anyway, them pictures that you took, the

6

girls must have wanted you to take 'em, or else they wouldn't of let you took 'em.

ALVIN SMITH: Of course they did.  But yeah, though they tryin' to make it seem like it's such a crime, such a crime. . . .

. . . .

ALVIN SMITH: . . . I told her, you know, just they takin' it too personal.  I mean, times have changed.

LUCILLE SMITH: And I'd of told her, well, now looky here.  I couldn't of took them pictures if them girls didn't want me to take 'em.  They posed and everything for me to take 'em.  It'd of been different if you just took it without they, uh, their acknowledgment.

ALVIN SMITH: I know.

To establish the statutes' jurisdictional element—i.e., that the pornography "was produced using materials that have been mailed, shipped, or transported in interstate or foreign commerce"—the Government called the Vice-President of Photo Operations for Eckerd's Drugs.  She testified that some of the photos were printed on Kodak paper that Eckerd's received from Rochester, New York, and processed by equipment that it received from California.

At the close of the evidence, the defense moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29.  As to the possession count, the defense argued that there was insufficient evidence that Smith knew that the girl was less than eighteen years of age.  The defense also argued that there was insufficient evidence to establish the jurisdictional element of either count.  The court denied the motion, and sent the case to the jury.  The jury returned a verdict

of guilty on both counts. The verdict included specific findings that the pornography was produced using film, photo paper, and a film processor that had traveled in interstate or foreign commerce.

## II.

According to the Supreme Court, "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases . . . pending on direct review or not yet final." Griffith v. Kentucky, 479 U.S. 314, 328, 107 S. Ct. 708, 716, 93 L. Ed. 2d 649 (1987). In this circuit, however, this principle does not apply if the defendant did not advance a claim based on the "new rule" in his opening brief on appeal. If the "new rule" is announced after the defendant's opening brief is filed, it will be applied retroactively only if the defendant made a similar argument in his initial brief, for we will not allow him to substitute or supplement his initial brief or petition for rehearing in order to raise the claim. See, e.g., United States v. Njau, 386 F.3d 1039, 1041-42 (11th Cir.2004) (letter submitted under Federal Rule of Appellate Procedure 28(j)); United States v. Hembree, 381 F.3d 1109, 1110 (11th Cir.2004) (substitute or amended principal brief); United States v. Curtis, 380 F.3d 1308, 1310-11 (11th Cir.2004) (supplemental brief); Levy, 379 F.3d at 1241-42 (petition for rehearing). Indeed, the Levy rule applies even if Supreme Court vacates our initial decision and remands the case for

8

reconsideration in light of the very case that announces the "new rule." United States v. Ardley, 242 F.3d 989, 990, reh'g en banc denied, 273 F.3d 991 (11th Cir.2001). Therefore, despite the fact that Maxwell was decided only after Smith filed his opening brief, its holding is irrelevant to our disposition of this case unless Smith's opening brief can be read to make a Maxwell-type argument.

In his supplemental letter memorandum, Smith contends that two of the issues raised in his opening brief encompass a Maxwell-type claim. A cursory review of the brief suggests that this is not the case. Smith's statement of issues vaguely frames these claims as "the district court erred in instructing the jury on the elements of the charges" and "in denying [his] motion for a judgment of acquittal." Moreover, Smith does not cite United States v. Morrison, 529 U.S. 598, 120 S. Ct. 1740, 146 L. Ed. 2d 658 (2000), United States v. Lopez, 514 U.S. 549, 115 S. Ct. 1624, 131 L. Ed. 2d 626 (1995), or any other case addressing the scope of the Federal Government's authority under the Commerce Clause. Indeed, the arguments to which Smith points us rely exclusively on First Amendment cases. It is clear that Smith's primary argument in these two sections is that the district court erred by failing to instruct the jury that knowledge of the victim's age is an essential element of both §2252A(a)(5)(B) and §2251(a) and that there was no evidence that Smith was aware that the victim was under eighteen years of age.

9

At least one passage of this section, however, all but hits the <u>Maxwell</u> claim on the head. Smith argues:

> [W]hile Congress has authority to pass laws affecting interstate and foreign commerce, Congress does not have authority to proscribe [sic] general criminal statutes. Smith contends in order for the [Child Pornography Prevention Act] to be constitutional under the Commerce Clause, the government must prove more than he took photos in Tampa, Florida, and developed the photos in Tampa, Florida, for personal possession, but the government must prove that producing or possession of photographs had a material affect [sic] on interstate commerce, and that Smith knew the photographs were developed using materials shipped in interstate or foreign commerce.

Over the next few pages, Smith contends that his conviction must be reversed because the Government presented no evidence that he knew that the materials used to produce the pictures traveled in interstate commerce. He also briefly argues that the "facts cannot support [that] he was a 'producer' as the evidence only shows photography for personal use rather than distribution and sale."

In his reply brief, Smith broadly asserts that "[t]he Government essentially attempts to limit the knowledge requirement for a penal statute while expanding the authority of Congress to proscribe [sic] general criminal statutes." He also reiterates his claim that the Government should have been required to prove both that he was aware that the materials used to produce the pornography had traveled in interstate commerce and that his "possession of the photographs had a material

10

effect on interstate commerce." Finally, he attempts to clarify his argument

regarding the statutory term "producing":

> Section 2251(a) is a charge for people in the <u>business</u> of making child pornography, which with an interstate or foreign nexus becomes a matter under the authority of Congress under the Commerce Clause, but applying Section 2251(a) to Smith was unconstitutional because Smith had nothing to do with producing child pornography if Section 2251(a) were to be constitutionally applied to Smith.

Giving Smith the benefit of the doubt, we think that this last argument is that §

2251(a) is beyond the authority of Congress under the Commerce Clause unless

the term "producing" is interpreted to refer to commercial production.[5]

Our principle that "briefs are read liberally with respect to ascertaining what

issues are raised on appeal" is longstanding. Kincade v. Gen. Tire & Rubber Co.,

635 F.2d 501, 504 (5th Cir. Jan. 30, 1981);[6] accord Starke, 62 F.3d at 1379;

Allstate Ins. Co. v. Swann, 27 F.3d 1539, 1542 (11th Cir. 1994); United States v.

Milam, 855 F.2d 739, 743 (11th Cir. 1988); FSLIC v. Haralson, 813 F.2d 370, 373

n.3 (11th Cir. 1987). Only those "[i]ssues that clearly are not designated in the

---

[5] Levy applies to reply briefs as well. Levy, 379 F.3d at 1244. Therefore, Smith's reply brief would be irrelevant were there no hint of a Maxwell-type claim in his initial brief; however, because Smith's opening brief appears to contain such a claim, we may consider "counsel's amplification of his position in the reply brief and at oral argument." Starke, 62 F.3d at 1379. At oral argument, counsel explicitly argued that Smith's conviction was unconstitutional under Maxwell and, not surprisingly, that this was part of the argument made in his initial brief.

[6] In Bonner v. Prichard, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

initial brief ordinarily are considered abandoned." Starke, 62 F.3d at 1379. Thus, even when it has been "extremely difficult to discern from [a defendant's] initial brief exactly what issues he raises on appeal," we have "liberally read" that brief and also considered "counsel's amplification of his position in the reply brief and at oral argument" in order to identify the issues presented. Id. And in Kincade, supra, we reasoned that even a few abbreviated descriptions of an argument are ordinarily sufficient to raise it on appeal, at least where other parts of the brief do not contain "express indications" that the appellant does not intend to advance that argument. 635 F.2d at 504-05.

Applying this principle to the instant case, we conclude that Smith's initial brief sufficiently raised the Maxwell issue. Smith specifically argued that in order to prosecute him under its Commerce Clause authority, "the government must prove more than he took photos in Tampa, Florida, and developed the photos in Tampa, Florida, for personal possession, but the government must prove that producing or possession of photographs had a material affect [sic] on interstate commerce." Cf. Maxwell, 386 F.3d at 1061 ("we review Maxwell's conduct independently and determine that its link to a substantial effect on interstate commerce, if any, is exceedingly attenuated"); id. at 1068 (holding that the mere fact that "the disks on which the pornography was ultimately copied traveled,

12

when blank, to Florida from someplace outside of Florida" does not transform purely intrastate criminal activity "into an activity subject to Commerce Clause regulation"). He also made the related argument that the statutes were unconstitutional unless their references to pornography production were interpreted to apply only to commercial production. Cf. id. (noting that the Government did not allege or prove any commercial purpose). In light of the fact that Maxwell was decided only after briefing in this case was completed, we read these claims liberally to encompass the issue decided in that case. It is, of course, helpful to the court if litigants cite Commerce Clause cases to support their Commerce Clause arguments, but we will not deem Smith's argument waived simply because counsel chose to rely on First Amendment cases instead.

## III.

The Government argues that even if we reach the Maxwell issue our review is limited to plain error because Smith failed to raise the issue at trial. Smith's attorney conceded the same at oral argument. On Smith's motion for a judgment of acquittal, there was some discussion of the Commerce Clause. Primarily, Smith's counsel argued that the Government had failed to establish the statutory jurisdictional hook, but at one point she did go so far to argue that "this is a case where the government is stretching this interstate commerce nexus as far as it can

13

and we believe it—far enough to break it." She also argued that, under "this set of circumstances, it is a stretch that there's any interstate commerce nexus at all, let alone one strong enough to meet the burden for federal prosecution." A reading of the entire transcript, however, suggests that counsel was making only a statutory interpretation argument, namely, that Congress did not intend to reach cases like this one under the relevant statutes. This impression is confirmed by the Assistant U.S. Attorney's response: "Congress has spoken. And they put directly in the statute that this is precisely the kind of interstate nexus the United States could use. . . . It is right in the statute. And this court would have to amend the statute in order to agree with [the defendant's] argument." Moreover, when the district judge denied Smith's motion, he stated, "This is not the time and place, I think, and perhaps not the statute to make the Lopez argument." If counsel was, in fact, making a constitutional argument, this would have been the time and place to clarify her position for the record. In light of her failure to do so, and appellate counsel's concession at oral argument, we will review the Maxwell issue for plain error only.

Under Federal Rule of Criminal Procedure 52(b), "[a] plain error that affects substantial rights may be considered even though it was not brought to the court's attention." "We have discretion to correct an error under the plain error standard

14

where (1) an error occurred, (2) the error was plain, (3) the error affected substantial rights, and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." United States v. Duncan, __ F.3d __, __ (11th Cir. 2004) (citing United States v. Olano, 507 U.S. 725, 732-36, 113 S. Ct. 1770, 1777-79, 123 L. Ed. 2d 508 (1993)). The error must be "plain" at the time of appellate consideration; the defendant is not required to establish that it was plain at the time of trial.[7]

---

[7] In Olano, the Supreme Court did "not consider the special case where the error was unclear at the time of trial but becomes clear on appeal because the applicable law has been clarified." Instead, it stated simply that, "[a]t a minimum, a court of appeals cannot correct an error pursuant to Rule 52(b) unless the error is clear under current law." Olano, 507 U.S. at 734, 113 S. Ct. at 1777. Subsequently, in Johnson v. United States, 520 U.S. 461, 117 S. Ct. 1544, 137 L. Ed. 2d 718 (1997), the Court held that "where the law at the time of trial was settled and clearly contrary to the law at the time of appeal . . . it is enough that an error be 'plain' at the time of appellate consideration." Id. at 468, 117 S. Ct. at 1549. Because the law at the time of Smith's trial was "unclear" rather than "settled and clearly contrary to" him, this case presents the issue that Olano reserved judgment on rather than the one that Johnson explicitly decided. See generally Maxwell, 386 F.3d at 1068 n.25 (noting a circuit split in similar cases).

Pre-Johnson, we broadly stated that "error is 'plain' . . . where the 'plainness' of error becomes apparent on direct review." United States v. Kramer, 73 F.3d 1067, 1074 n.16 (11th Cir. 1996). But Kramer was not a "special case" of the sort described in Olano; rather, it presented the issue explicitly decided in Johnson. See Kramer, 73 F.3d at 1074. Post-Johnson, we considered the Olano "special case" issue and held that it was appropriate to evaluate the plainness of the error based on the law at the time of appeal rather than as of the time of trial. United States v. Humphrey, 164 F.3d 585, 587-88 & nn.2 & 5 (11th Cir. 1999); see also United States v. Prieto, 232 F.3d 816, 823 (11th Cir. 2000) ("For it to be 'plain,' the error must either have been clear under the law at the time the error was made, or clearly contrary to the law at the time of the appeal.").

In contrast, the Ninth Circuit has limited Johnson to its narrow holding: if the law is merely "unsettled" at the time of trial, whether the error was "plain" will be determined under that unsettled law. United States v. Turman, 122 F.3d 1167, 1170-71 (9th Cir. 1997). The court reasons that Johnson's apparent concern—that evaluating error as of the time of trial would lead to trial "counsel's inevitably making a long and virtually useless laundry list of objections to rulings that were plainly supported by existing precedent," Johnson, 520 U.S. at 468, 117 S. Ct.

15

A.

We first conclude that, under <u>Maxwell</u>, error occurred because Smith's purely intrastate, non-commercial production and possession of child pornography is not subject to Commerce Clause regulation. We begin with the simple principle that "Congress can legislate only within the ambit of the specific powers the Constitution confers on it." <u>Maxwell</u>, 386 F.3d at 1053-54. The Constitution grants Congress the authority "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. In <u>Lopez</u>, the Supreme Court explained that there are "three broad categories of activity that Congress may regulate under its commerce power":

> First, Congress may regulate the use of the channels of interstate

---

at 1549—is inapplicable if the law was not settled at the time of trial. <u>Turman</u>, 122 F.3d at 1170-71. In practice, of course, this is the same as no plain error review at all, as error will never be "plain" under "unsettled" law. Thus, the defendant is obliged to object if the law is unsettled, and if he does not he has waived the objection forever.

"Under the prior panel rule, we are bound by the holdings of earlier panels unless and until they are clearly overruled en banc or by the Supreme Court." <u>Swann v. S. Health Partners, Inc.</u>, 388 F.3d 834, 837 (11th Cir. 2004). "But, the prior panel rule does not extend to dicta." <u>Id.</u> Arguably, <u>Humphrey</u> does not "hold" that error need only be "plain" at the time of appeal in a case such as this one, as the <u>Humphrey</u> panel decided against the defendant even under that more generous standard. <u>See, e.g.</u>, <u>Black v. United States</u>, 373 F.3d 1140, 1144 (11th Cir. 2004) ("<u>Dictum</u> is a term that has been variously defined as a statement that neither constitutes the holding of a case, nor arises from a part of the opinion that is necessary to the holding of the case."). Even if we assume, though, that we are not bound by <u>Humphrey</u>, we would evaluate cases such as this one under current law because this approach has the advantage of avoiding the necessity of distinguishing between cases in which "the law at the time of trial was settled and clearly contrary to the law at the time of appeal" on the one hand and cases in which it was merely "unsettled" on the other.

16

commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce.

Lopez, 514 U.S. at 558-59, 115 S. Ct. at 1629-30 (citations omitted). As in Maxwell, we have no difficulty concluding that the challenged statutes govern neither the channels nor the instrumentalities of interstate commerce. See Maxwell, 386 F.3d at 1055. Although Smith, unlike Maxwell, was convicted for production under § 2251(a) in addition to possession under § 2252A(a)(5)(B), this distinction does not bring his conduct within either "Lopez 1" or "Lopez 2," as the production of child pornography has no more to do with the channels of interstate commerce than mere possession does, and "the Government did not establish that the proscribed images were 'things in interstate commerce.'" Id. (quoting Lopez, 514 U.S. at 558, 115 S. Ct. at 1629).

Therefore, Congress has the power to proscribe Maxwell's conduct only if it is subject to regulation under "Lopez 3," i.e., only if it "substantially affects" interstate commerce. In United States v. Morrison, drawing on its earlier decision in Lopez, the Supreme Court outlined four factors that are important to this question: First, we must determine whether the challenged statute has anything "to

17

do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." Morrison, 529 U.S. at 610, 120 S. Ct. at 1749-50 (quoting Lopez, 514 U.S. at 561, 115 S. Ct. at 1624). Indeed, "a fair reading of Lopez shows that the noneconomic, criminal nature of the conduct at issue was central to [the] decision in that case." Morrison, 529 U.S. at 610, 120 S. Ct. at 1750. Second, we consider whether the statute contains an "express jurisdictional element which might limit its reach to a discrete set of [cases] that . . . have an explicit connection with or effect on interstate commerce." Id. at 611-12, 120 S. Ct. at 1750-51 (quoting Lopez, 514 U.S. at 562, 115 S. Ct. at 1624). Third, congressional findings, if relevant, may inform our inquiry. Morrison, 529 U.S. at 612, 120 S. Ct. at 1751. Finally, Morrison directs us to consider the degree of attenuation between the activity and the purported effect on commerce. Id. at 612-13, 120 S. Ct. at 1751.[8] With these factors in mind, we must determine whether there is anything about Smith's case that can distinguish it from Maxwell for Commerce Clause purposes. Because there is no significant difference between Smith's possession and Maxwell's possession, our analysis will focus on Smith's

---

[8] The first and fourth Morrison factors are "the most important ones. An activity that is utterly lacking in commercial or economic character would likely have too attenuated a relationship to interstate commerce and would, accordingly, not be subject to regulation under the Commerce Clause." United States v. McCoy, 323 F.3d 1114, 1119 (9th Cir. 2003).

intrastate, non-commercial production of child pornography.

1.

As in <u>Maxwell</u>, "we discern nothing commercial or economic" about Smith's conduct. <u>Maxwell</u>, 386 F.3d at 1056. <u>Wickard v. Filburn</u>, 317 U.S. 111, 63 S. Ct. 82, 87 L. Ed. 122 (1942), "is perhaps the most far reaching example of Commerce Clause authority over intrastate activity," <u>Lopez</u>, 514 U.S. at 560, 115 S. Ct. at 1630, and yet Smith's conviction, if upheld, would reach much further. In <u>Wickard</u>, the Supreme Court upheld a federal regulatory program that restricted the amount of wheat a farmer might produce not only for sale and distribution, but also for consumption on his own farm. An Ohio farmer challenged the statute on the ground that Congress lacked the power to regulate his purely local production and consumption and its minimal indirect effect on interstate commerce. <u>See</u> <u>Wickard</u>, 317 U.S. at 113-19, 63 S. Ct. at 83-86. The Court, however, rejected his argument and explained why the statute was a permissible method of regulating interstate commerce:

> The maintenance by government regulation of a price for wheat undoubtedly can be accomplished as effectively by sustaining or increasing the demand as by limiting the supply. The effect of the statute before us is to restrict the amount which may be produced for market and the extent as well to which one may forestall resort to the market by producing to meet his own needs. That appellee's own contribution to the demand for wheat may be trivial by itself is not

enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial.

It is well established by decisions of this Court that the power to regulate commerce includes the power to regulate the prices at which commodities in that commerce are dealt in and practices affecting such prices. One of the primary purposes of the Act in question was to increase the market price of wheat and to that end to limit the volume thereof that could affect the market. It can hardly be denied that a factor of such volume and variability as home-consumed wheat would have a substantial influence on price and market conditions. This may arise because being in marketable condition such wheat overhangs the market and if induced by rising prices tends to flow into the market and check price increases. But if we assume that it is never marketed, it supplies a need of the man who grew it which would otherwise be reflected by purchases in the open market. Home-grown wheat in this sense competes with wheat in commerce. The stimulation of commerce is a use of the regulatory function quite as definitely as prohibitions or restrictions thereon. This record leaves us in no doubt that Congress may properly have considered that wheat consumed on the farm where grown if wholly outside the scheme of regulation would have a substantial effect in defeating and obstructing its purpose to stimulate trade therein at increased prices.

Id. at 127-29, 63 S. Ct. at 90-91 (citations and footnote omitted).

In other words, the Wickard regulation sought to maintain national market prices by controlling supply and demand. The Court noted that "[c]ommerce among the states in wheat is large and important," that "wheat [was] raised in every state but one," that "[t]he wheat industry [had] been a problem industry for some years," and that in the absence of regulations wheat prices would have been greatly affected by the world market. Id. at 125-26, 63 S. Ct. 89-90. Because this

20

regulation was so plainly intended to regulate commerce, the Court held that it was appropriate to consider the "far from trivial" aggregate effect on the market of all consumption of home-grown wheat rather than the isolated effect of a single Ohio farmer. Id. at 127-28, 63 S. Ct. 90; see also id. at 127, 63 S. Ct. at 90 ("The effect of consumption of homegrown wheat on interstate commerce is due to the fact that it constitutes the most variable factor in the disappearance of the wheat crop.").

Whereas the Wickard statute regulated an interstate market indirectly through regulation of purely local production, the same cannot be said of § 2251(a) or § 2252A(a)(5)(B). These statutes "make[] no effort to control national trade by regulating intrastate activity. Instead, [they] attempt[] to regulate primary conduct directly, even within state borders." Maxwell, 386 F.3d at 1057. Even if, in the aggregate, offenders like Smith somehow impact an interstate market by producing child pornography for their own use, "Congress is clearly not concerned with the supply of child pornography for the purpose of avoiding surpluses and shortages or for the purpose of stimulating its trade at increased prices." Id. The conclusion is thus inevitable that the statutes under which Smith was convicted are not concerned "with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." Morrison, 529 U.S. at 610, 120 S. Ct. at 1749-50 (quoting Lopez, 514 U.S. at 561, 115 S. Ct. at 1624). "As the regulated

21

activity . . . is not commercial, <u>Wickard</u>'s aggregation analysis is not applicable." <u>Raich v. Ashcroft</u>, 352 F.2d 1222, 1230 (9th Cir. 2003), <u>cert. granted</u>, 124 S. Ct. 2909, 159 L. Ed. 2d 811 (2004); <u>see also</u> <u>Morrison</u>, 529 U.S. at 611 n.4, 120 S. Ct. at 1750 n.4 ("in every case where we have sustained federal regulation under the aggregation principle in [<u>Wickard</u>], the regulated activity was of an apparent commercial character"). <u>Wickard</u> is thus readily distinguishable, as the statute it sustained was far more obviously a regulation of commerce. We are not inclined to expand the limits of the federal commerce power beyond what the Supreme Court has suggested to be its outer limits.

2.

As in <u>Maxwell</u>, the Government relies on a statutory jurisdictional hook to establish federal jurisdiction over Smith's offenses: the pictures were "produced using materials that [had] been mailed, shipped, or transported in interstate or foreign commerce." 18 U.S.C. §§ 2251(a), 2252A(a)(5)(B). In <u>Maxwell</u>, we held that this jurisdictional hook was "patently insufficient to ensure the statute's constitutional application." <u>Maxwell</u>, 386 F.3d at 1063. We will not reiterate all that we said there, as the point can be made briefly: A jurisdictional hook is constitutionally significant <u>only if</u> it will "ensure, through case-by-case inquiry, that the [offense] in question affects interstate commerce." <u>Lopez</u>, 514 U.S. at

22

561, 115 S. Ct. at 1631. Where, as here, Congress seeks to regulate under "Lopez 3," the hook is only significant if it essentially requires the Government to prove that the offender's conduct substantially affects interstate commerce. The jurisdictional element used in both § 2251(a) and § 2252A(a)(5)(B), however, "not only fails to limit the reach of the statute[s] to any category or categories of cases that have a particular effect on interstate commerce, but, to the contrary, it encompasses virtually every case imaginable, so long as any modern-day photographic equipment or material has been used." United States v. McCoy, 323 F.3d 1114, 1124 (9th Cir. 2003) (evaluating an identical jurisdictional element in 18 U.S.C. § 2252(a)(4)(B)). As such, the fact that Smith's pictures were "produced using materials that [had] been mailed, shipped, or transported in interstate or foreign commerce" does not affect our constitutional analysis.[9]

3.

In Maxwell, we reviewed the legislative history of § 2252A and some related statutory provisions—including 18 U.S.C. § 2251, see Maxwell, 386 F.3d

---

[9] We express no opinion on the statutes' other jurisdictional hooks. 18 U.S.C. § 2251(a) ("if such person knows or has reason to know that such visual depiction will be transported in interstate or foreign commerce or mailed . . . or if such visual depiction has actually been transported in interstate or foreign commerce or mailed"); 18 U.S.C. § 2252A ("Any person who knowingly possesses any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported in interstate or foreign commerce . . . .").

at 1066 n.24—and "[found] nothing to persuade us that possessing child pornography produced with materials transported in interstate commerce is an activity that has a substantial effect on interstate commerce." Id. at 1067. "Instead, the vast majority of the findings support the broader proposition"—which we are certainly prepared to accept—"that child pornography (even that which is generated by computer without actual people) is bad and harmful to children." Id. at 1065.

A recent First Circuit opinion succinctly summarizes the additional legislative history and congressional findings relevant to 18 U.S.C. § 2251(a):

> When Congress originally passed the Protection of Children Against Sexual Exploitation Act of 1977 . . . it supported the legislation with findings that "child pornography . . . has become [a] highly organized, multimillion dollar industr[y] that operate[s] on a nationwide scale . . . [and that] the sale and distribution of such pornographic materials are carried on to a substantial extent through the mails and other instrumentalities of interstate and foreign commerce."
> In 1984, Congress amended the Act to, inter alia, eliminate the requirement that the production, receipt, transportation, or distribution of child pornography be for a "pecuniary profit." Congress did so because it found that this commercial purpose requirement created an enforcement gap: "Many of the individuals who distribute materials covered [by the statute] do so by gift or exchange without any commercial motive and thus remain outside the coverage of this provision." Noting that "[g]enerally, the domestic material is of the 'homemade' variety, while the imported material is produced by commercial dealers," Congress determined that the statutory regime must be updated to ensure effective prosecution of

producers and distributors.

Congress amended the Act again [in 1986 after] finding that "child exploitation has become a multi-million dollar industry, infiltrated and operated by elements of organized crime, and by a nationwide network of individuals openly advertising their desire to exploit children."

In 1996, Congress amended the Act to redefine child pornography . . . .  In passing those amendments, Congress found that "the existence of a traffic in child pornographic images . . . inflames the desires of child molesters, pedophiles, and child pornographers who prey on children, thereby increasing the creation and distribution of child pornography. . . ."  The Senate Report also explained that "prohibiting the possession and viewing of child pornography will encourage the possessors of such material to rid themselves of or destroy the material, thereby helping . . . to eliminate the market for the sexual exploitative use of children."

Finally, Congress amended the Act again in 1998, establishing jurisdiction for the production of child pornography if the "visual depiction was produced using materials that have been mailed, shipped, or transported in interstate or foreign commerce by any means," which is the provision now before us.  Congress offered two reasons for this amendment.  First, it wanted the new jurisdictional element of the production statute to mirror the existing jurisdictional element of the possession statutes.  Second, Congress was concerned about federal law enforcement's current inability to prosecute "a number of cases where the defendant produced the child pornography but did not intend to transport the images in interstate commerce."

United States v. Morales-De Jesus, 372 F.3d 6, 10-12 (1st Cir. 2004) (citations and footnotes omitted).  We will comment on each of these findings separately.

We have already addressed the 1977 findings in Maxwell.  These findings "remark[] only on interstate child pornography and teach[] nothing about the effects of intrastate child pornography or noncommercial child pornography for

25

that matter." Maxwell, 386 F.3d at 1066. The same can be said of the 1986 findings. That we are here concerned with noncommercial production for personal use rather than mere noncommercial possession is not significant. The substance of these findings is merely that a multimillion dollar interstate industry exists, not that noncommercial producer-consumers such as Smith substantially affect it. To say that such findings support federal jurisdiction in this case is the equivalent of saying that Congress can, for example, regulate backyard cookouts simply because a multibillion-dollar interstate restaurant industry exists.

The 1984 findings refer to the problem of individuals who trade, lend, or otherwise distribute child pornography without a commercial purpose. If Smith had been prosecuted for such noncommercial distribution of child pornography, then these findings might be relevant. They do not, however, establish that the noncommercial production of child pornography for the producer's own use substantially affects interstate commerce.

The 1996 findings relate solely to the "addiction theory"—i.e., the theory that a person possessing intrastate child pornography could develop an increasing appetite for more such materials that eventually affects the interstate market substantially—adopted by the Third Circuit in United States v. Rodia, 194 F.3d 465, 478-79 (3d Cir. 1999). We previously rejected this theory in Maxwell, and

26

our reasoning applies with equal force here. The theory simply "provides too attenuated a link to interstate commerce and would require us 'to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States.'" Maxwell, 386 F.3d at 1061 (quoting Lopez, 514 U.S. at 567, 115 S. Ct. at 1634).

Finally, Congress's rationale for amending the statute in 1998 to add the jurisdictional provision at issue does nothing to explain how producer-consumers such as Smith substantially affect interstate commerce. Indeed, in 1998 Congress merely explained that under the old version of the statute it had been unable to reach some conduct that it wished to proscribe. That Congress wanted to prosecute more child pornographers is understandable, but it has little to do with interstate commerce.

In sum, the relevant congressional findings do little to persuade us that activity such as that at issue in this case substantially affects interstate commerce. "[T]he existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation." Morrison, 529 U.S. at 614, 120 S. Ct. at 1752. "[S]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so."

Hodel v. Va. Surface Mining & Reclamation Ass'n, 452 U.S. 264, 311, 101 S. Ct. 2352, 2391, 69 L. Ed. 2d 1 (1981) (Rehnquist, J., concurring in the judgment). The findings noted above support the proposition that intrastate <u>commercial</u> producers of child pornography affect interstate commerce. They even suggest that persons who <u>distribute</u> child pornography noncommercially affect the interstate market. They do not, however, support the proposition that purely intrastate production and possession for personal use have a similar effect.[10]

4.

In <u>Maxwell</u>, we concluded that any link between the defendant's conduct and a substantial effect on interstate commerce was, at best, "exceedingly attenuated." <u>Maxwell</u>, 386 F.3d at 1061. Indeed, we reasoned that "[t]he causal chain necessary to link his activity with any substantial impact on interstate commerce might be long enough to reach the outer limits of the solar system." <u>Id.</u>

---

[10] The First Circuit viewed these findings differently; it concluded that, "[g]iven this comprehensive backdrop, there is no question that Congress has made explicit findings about the extensive national market in child pornography and the need to diminish that national market by prohibiting the production of child pornography at the local level." <u>Morales-De Jesus</u>, 372 F.3d at 12. As explained in the text, we do not question the first part of this statement—that is, the findings support the existence of a national market in child pornography—but we fail to see any substantial connection between it and producer-consumers such as Smith. We thus part with the First Circuit on this point. <u>See</u> <u>id.</u> at 21 ("Morales sexually exploited a thirteen-year-old girl, coercing her into performing sex acts with him on multiple occasions, for the purpose of videotaping their encounters. As this conduct seems well within the bounds of what Congress intended—and had the authority—to proscribe under its Commerce Clause power, we reject Morales's as-applied challenge.").

28

at 1058. We noted that some circuits had identified a more direct impact by aggregating the effect of all similar offenders. Id. at 1059 & n.17. But as we explained in Part III.A.1, supra, "this aggregate approach cannot be applied to intrastate criminal activity of a noneconomic nature." Id. at 1059. Therefore, "[t]he effect on . . . interstate commerce . . . must be measured in relation to the isolated conduct at issue, rather than as a nationwide aggregate, because the intrastate possession of child pornography is a criminal, noneconomic activity." Id. at 1061. We also rejected the argument that a more direct connection could be established via the "addiction theory" discussed in Part III.A.3, supra. Id.

With respect to the degree of attenuation between the conduct at issue and the ultimate effect, if any, on interstate commerce Maxwell and the present case are virtually indistinguishable. That Smith's conduct is more reprehensible simply has no bearing on its connection to interstate commerce. His production and possession was intrastate, criminal, and noneconomic. Therefore, aggregation is not appropriate. Judged in isolation, any link between Smith's conduct and a substantial effect on interstate commerce is "exceedingly attenuated." And for the same reasons given in Maxwell and in Part III.A.3, supra, the "addiction theory" is so far reaching and reliant upon inference that it cannot provide a basis for establishing a direct link to interstate commerce.

29

* * * * *

In sum, we hold that Smith's conduct does not substantially affect interstate commerce. Because it is a noneconomic, purely intrastate criminal activity, we may consider only its isolated effects, not the aggregate effect of all such activity that occurs nationwide. The activity Smith engaged in is not "commercial" or "economic" in any sense of those terms. The jurisdictional element in § 2251(a) and § 2252(a)(5)(B) is, for Commerce Clause purposes, utterly useless given that "it encompasses virtually every case imaginable." McCoy, 323 F.3d at 1124. The relevant congressional findings, though perhaps useful in cases involving commercial producers or even noncommercial distributors or traders, are of little, if any, import in the case of a defendant who has produced child pornography for his own use entirely within the borders of a single state. Finally, the link between Smith's activity and a substantial effect on interstate commerce is, at best, exceedingly attenuated. In light of these factors, Congress lacks the power under the Commerce Clause to proscribe Smith's conduct, "error" occurred, and the first prong of the plain error standard is met.

The Government's attempts to distinguish Maxwell are unpersuasive. The Government emphasizes that Maxwell invalidated § 2252A(a)(5)(B) as applied and therefore cannot be automatically extended to the facts of this case. See

30

<u>Maxwell</u>, 386 F.3d at 1052-53 & n.12.  It also points out that <u>Maxwell</u> explicitly

reserved decision as to whether the production of child pornography is within the

power of Congress to proscribe.[11]  This is true, but applying the reasoning of

<u>Lopez</u>, <u>Morrison</u>, and <u>Maxwell</u> to this case, we discern no constitutionally

significant distinctions.  In reaching this conclusion, we decline the Government's

invitation to infer that Smith distributed child pornography.  In its supplemental

---

[11] For example, we reserved "judgment . . . as to whether the distinct acts of producing, buying, selling, trading, warehousing, distributing, or marketing child pornography constitute economic or commercial activity."  <u>Maxwell</u>, 386 F.3d at 1056 n.15.  We note, however, that production—at least, that is, production for personal use—is by far the least "commercial" of these activities and has easily the most attenuated link to interstate commerce.

The Government also points to <u>Maxwell</u>'s statement that "there is simply no record evidence to suggest that Maxwell was a potential child molester or that his conduct would likely increase the creation and distribution of child pornography elsewhere, much less to the extent that such creation and distribution would have a substantial effect on interstate commerce."  <u>Id.</u> at 1059.  In contrast, there is evidence that Smith is, as the Government puts it, "not only a 'potential child molester,' but an accomplished one."  While this fact certainly makes Smith more worthy of punishment, we do not see how it makes him more worthy of <u>federal</u> punishment, <u>i.e.</u>, how it provides a more direct link between his conduct and interstate commerce.  Moreover, although Smith's conduct obviously did "increase the creation . . . of child pornography," the evidence was that this creation was for personal use.  Therefore, Smith did <u>not</u> increase distribution or creation "elsewhere," which is really what this passage from <u>Maxwell</u> is about—<u>i.e.</u>, the idea that any distribution of child pornography eventually affects and increases the interstate market and leads to even more creation and distribution.  And, as we have explained at length in this Part, there is no evidence that Smith's conduct, viewed in isolation, had a substantial effect on interstate commerce.

Finally, in <u>Maxwell</u> we listed a number of things that the Government had not proven, among them "that Maxwell produced the pornography."  <u>Id.</u> at 1068.  We also noted, however, that there was no proof that Maxwell (1) purchased pornography, (2) traded or distributed pornography, (3) affected the market supply of pornography, (4) encouraged others to seek pornography, (5) obtained the pornography itself through the internet or any other channel of interstate commerce or even (6) from another state, or (7) took or intended to take the pornography out of state for either commercial or personal use.  <u>Id.</u>  All of these observations, of course, apply with equal force to the instant case.

letter memorandum, the Government notes that there was not a matching developed picture or copy for every "thumbnail print" in the lockbox. It then argues that the absence of these pictures "readily supports the inference that both the original pictures of Smith's victim and copies of several of those pictures are 'in circulation.'" However, Smith was not indicted for distributing child pornography. Nor did the jury specifically or necessarily find that he had distributed child pornography. Indeed, the fact that the missing photos were not in the seized lockbox just as "readily supports the inference" that they were somewhere in the Smith home that the officers did not search. Thus, we continue to reserve judgment as to whether proof of noncommercial distribution—as well as numerous other activities, see Maxwell, 386 F.3d at 1056 n.15—would be sufficient to sustain a conviction under the Commerce Clause.

B.

In this section, we address the question whether the Maxwell error was "plain." "Plain error is, by its terms, error which is so obvious and substantial that it should not have been permitted by the trial court even absent the defendant's timely assistance in detecting it." United States v. Prieto, 232 F.3d 816, 823 (11th Cir. 2000). In a case such as this, where the law was unsettled at the time of trial and has been clarified by the time of appeal, the defendant need only show that the

32

error is plain under current law; Smith is not required to show that the error was plain at the time of trial. See supra note 7. Thus, we modify the ordinary standard and ask, "If Smith's prosecution were initiated today, would his conduct be so obviously beyond the power of Congress to proscribe that the district court should raise the issue sua sponte even absent a timely objection?" In light of Maxwell, we answer this question in the affirmative; accordingly, we hold that the error identified in Part III.A, supra, was plain.

At the outset, we note that the rule in this circuit is that "where neither the Supreme Court nor this Court has ever resolved an issue, and other circuits are split on it, there can be no plain error in regard to that issue." United States v. Aguillard, 217 F.3d 1319, 1321 (11th Cir. 2000). The Supreme Court has never resolved this issue, and, as we acknowledged in Maxwell, 386 F.3d at 1068 n.25, other circuits are split on it. Therefore, the error is plain only if Maxwell itself made it so. We hold that it did for two reasons: First, the differences between Maxwell and this case are, at least for Commerce Clause purposes, truly minimal. Both prosecutions based jurisdiction on the fact that certain materials traveled in interstate commerce before the defendant used them, which Maxwell thoroughly discredited as a means for establishing constitutional jurisdiction. The only real difference between the two cases is that Maxwell involved intrastate possession

33

for personal use, whereas the present case involves intrastate possession and production for personal use. Second, on each of the four Morrison factors, the conclusion is inescapable that Maxwell's reasoning applies to Smith's case.

Significantly, in Maxwell we reasoned that § 2252A(a)(5)(B) is not an "effort to control national trade by regulating intrastate activity. Instead, it attempts to regulate primary conduct directly, even within state borders." Id. at 1057. Distinguishing Wickard, we reasoned that Congress clearly has no interest in controlling "the supply of child pornography for the purpose of avoiding surpluses and shortages or for the purpose of stimulating its trade at increased prices." Id. We also noted that the statute's jurisdictional hook "smacks of pretext," as Congress clearly has no interest in reducing traffic in production materials such as cameras or film. Id. at 1058. "Thus, we conclude[d] that the regulated intrastate activity . . . [was] more similar by far to the brand of intrastate criminal conduct that is a proper subject of state regulation alone than it is to the sort of economic activity addressed in Wickard." Id. Indeed, "the noneconomic, criminal nature of Maxwell's conduct [was] central to our decision." Id. This reasoning applies with equal force here. In this context, intrastate production for personal use is no more a plausible subject of "market" regulation than is intrastate possession for personal use. Smith's conduct, like Maxwell's, is obviously

34

noneconomic and criminal in nature. Accordingly, it is "plain" that Morrison's first factor weighs against sustaining federal regulation of it.

Maxwell found the same jurisdictional hook at issue in this case to be "patently insufficient" as a constitutional matter. Id. at 1063. Also, the Maxwell court reviewed most of the congressional findings that are relevant and found "nothing to persuade [it] that possessing child pornography produced with materials transported in interstate commerce is an activity that has a substantial effect on interstate commerce." Id. at 1067. In this case, we address intrastate production for personal use, but the problem that was evident and emphasized in Maxwell is evident here as well: the findings merely persuade that a lucrative child pornography industry exists, not that the activity at issue in this case has any sort of substantial effect on it. See id. at 1066. In short, it is "plain" to us that the second and third Morrison factors weigh against the Government.

Evaluating the final Morrison factor—the degree of attenuation between the charged conduct and any substantial effect on interstate commerce—the Maxwell court began by reasoning that the nonecomic, criminal nature of the conduct "alone necessarily attenuates the relationship . . . to some degree." Id. at 1058. But just how attenuated that relationship was became clear only after considering Maxwell's specific, isolated conduct. Id. This approach was required because the

35

Wickard "aggregate approach cannot be applied to intrastate criminal activity of a noneconomic nature." Id. at 1059. When viewed in isolation, "[t]he causal chain necessary to link [Maxwell's] activity with any substantial impact on interstate commerce might be long enough to reach the outer limits of the solar system." Id. at 1058. Even if we assume that Smith's production places him one link closer to interstate commerce in the causal chain (and thus one link removed from the outer limits of the solar system), it is clear under Maxwell that the connection between Smith's conduct and a substantial effect is extremely remote. The only hope the Government would have under this prong would be to rely on the Wickard aggregation principle. But Maxwell squarely holds that this principle "cannot be applied to intrastate criminal activity of a noneconomic nature," which clearly includes Smith's conduct. Therefore, it is again "plain" that the fourth and final Morrison factor weighs heavily against the Government.

The Government suggests that this case can be distinguished (if not on the merits, then at least enough so that the error was not "plain") based on Maxwell's passing observation that there was "simply no record evidence to suggest that Maxwell was a potential child molester or that his conduct would likely increase the creation and distribution of child pornography elsewhere." Id. at 1059. Read in context, see supra note 10, however, the primary import of this observation is

36

that Maxwell was not contributing child pornography to the market.  There is also

no evidence here that Smith was contributing to the market.  In any event, in light

of the rest of the opinion's obvious applicability to the facts of this case, this

single sentence simply is not significant.

In sum, we think that it is plain that <u>Maxwell</u>'s reasoning under all four

prongs of <u>Morrison</u> applies here and that Smith's conduct is beyond the power of

Congress to proscribe.  If an identical prosecution were initiated in one of the

district courts in this circuit today, we would expect the court to raise the issue <u>sua</u>

<u>sponte</u> even absent an objection on the part of the defendant.  It is true that

<u>Maxwell</u>'s facts are not identical, and it did not specifically address § 2251(a), but

we discern no distinction that makes the resolution of the question presented here

anything less than clear under current law.  The rule in the qualified immunity

context is that "[f]or a constitutional right to be clearly established, its contours

must be sufficiently clear that a reasonable official would understand that what he

is doing violates that right.  <u>The very action in question does not have to have</u>

<u>been found unlawful, but in light of pre-existing law the unlawfulness must be</u>

<u>apparent</u>." <u>Magluta v. Samples</u>, 375 F.3d 1269, 1283 (11th Cir. 2004) (emphasis

added) (citing <u>Hope v. Pelzer</u>, 536 U.S. 730, 739, 122 S. Ct. 2508, 2515, 153 L.

Ed. 2d 666 (2002)).  Similarly, under Rule 52(b) it is not necessary for a previous

case to have found that the very conduct in question is beyond the power of

Congress to proscribe; rather, it is enough that—as is the case here—the error be

"'clear' or . . . 'obvious.'" Olano, 507 U.S. at 734, 113 S. Ct. at 1777.[12]

[12] As in Maxwell, we acknowledge that other courts have reached different results in similar, though not identical, cases. Compare McCoy, 323 F.3d at 1126, 1133 (holding that an identical jurisdictional element in 18 U.S.C. § 2252(a)(4)(B) "provides no support for the . . . assertion of federal jurisdiction" and that Congress cannot proscribe "simple intrastate possession of a visual depiction (or depictions) that has not been mailed, shipped, or transported interstate and is not intended for interstate distribution or for economic or commercial use, including the exchange of the prohibited material for other prohibited material"), United States v. Corp, 236 F.3d 325, 333 (6th Cir. 2001) (holding that the identical jurisdictional element in § 2252(a)(4)(B) was insufficient to establish federal jurisdiction and that Congress cannot proscribe intrastate, noncommercial possession of child pornography—at least to the extent that the proscription reaches a twenty-three-year-old defendant's possession of photos of himself engaged in consensual sex with a seventeen-year-old), United States v. Jeronimo-Bautista, 319 F. Supp. 2d 1272, 1277-83 (D. Utah 2004) (holding § 2251(a) unconstitutional as applied to the purely local crime of a defendant who took pictures of, and participated in, the sexual assault of a minor), and United States v. Matthews, 300 F. Supp. 2d 1220, 1237-38 (N.D. Ala. 2004) (holding § 2251(a) and § 2252A(a)(5)(B) unconstitutional as applied to intrastate production and possession of child pornography that has not traveled in interstate commerce and is not intended for interstate or economic distribution of any kind), with United States v. Holston, 343 F.3d 83, 90-91 (2d Cir. 2003) (upholding § 2251(a) as applied to intrastate, noncommercial production of child pornography), United States v. Kallestad, 236 F.3d 225, 227-31 (5th Cir. 2000) (upholding a conviction for intrastate, noncommercial possession of child pornography under § 2252(a)(4)(B)), United States v. Angle, 234 F.3d 326, 335-38 (7th Cir. 2000) (upholding a conviction for intrastate, noncommercial possession of child pornography under § 2252(a)(4)(B) where the defendant was also convicted of ordering child pornography via email and soliciting a minor to engage in sexually explicit activity via telephone and the internet), Rodia, 194 F.3d at 470-82 (concluding that the identical jurisdictional element in § 2252(a)(4)(B) was essentially useless but nonetheless upholding a conviction for intrastate noncommercial possession of child pornography), and United States v. Bausch, 140 F.3d 739, 740-41 (8th Cir. 1998) (upholding a conviction for intrastate noncommercial possession of child pornography solely on the basis of § 2252(a)(4)(B)'s identical jurisdictional element). In Maxwell, we explicitly rejected the reasoning of a number of those cases upholding similar convictions. See Maxwell, 386 F.3d at 1059 & n.17, 1061, 1066, 1068 n.25. Therefore, even though some of these opinions addressed production of child pornography rather than mere possession, they remain unpersuasive because they did so by committing some combination of the following errors: characterizing plainly noncommercial activity as "commercial," applying the inapplicable Wickard aggregation principle, emphasizing inapposite congressional findings, and relying on a patently deficient

C.

Under Rule 52(b), we have the discretion to correct a plain error only if it "affects substantial rights." In general, this "means that the error must have been prejudicial: It must have affected the outcome of the district court proceedings." Olano, 507 U.S. at 734, 113 S. Ct. at 1778. We have no difficulty concluding that Smith's "substantial rights" were affected: the court sentenced him to 188 months in prison and 60 months of supervised release, whereas Maxwell requires that his

jurisdictional element. We place far more significance on the fact that a district court within this circuit—even without the benefit of Maxwell—recently had little difficulty concluding that §§ 2251(a) and 2252(a)(5)(B) were unconstitutional as applied to essentially indistinguishable facts. Matthews, 300 F. Supp. 2d at 1227-1238.

Two circuits have suggested that a defendant who is "clearly involved in exactly the type of child-exploitive and abusive behavior that Congress sought to prohibit" is more likely to be subject to federal jurisdiction. United States v. Andrews, 383 F.3d 374, 378 (6th Cir. 2004) (distinguishing Corp, supra, on this basis); accord Morales-De Jesus, 372 F.3d at 20-21. The reasoning of these opinions seems to be as follows: First, as long as it is actually regulating interstate commerce, Congress is free to legislate for "moral" or "social" reasons. See Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 257, 85 S. Ct. 348, 357-58, 13 L. Ed. 2d 258 (1964). This principle is well-established. Second, the child pornography statutes were intended to protect children from sexual exploitation; Congress obviously has no interest in regulating the market for child pornography in the ordinary sense. So far, so good. Third, because the real purpose of the statutes is to protect children from exploitation, they can be constitutionally applied to any case in which the defendant himself has exploited children. It is this suggestion that is novel and unsupported by precedent. Federal moral or social legislation under the Commerce Clause is constitutional if, and only if, it is a regulation of commerce. When Congress has chosen address a moral wrong through commercial regulation, it lacks the power to then insist that the regulation be applied wherever the wrong is found. This point should be obvious: it is the substantial effect on interstate commerce, not the moral wrong, that supports federal jurisdiction. Cf. Matthews, 300 F. Supp. 2d at 1235 ("[T]he government would have the court substitute an issue of unquestioned national concern, child pornography, for the constitutional requirement that the government demonstrate that the video tape produced and possessed wholly within one state had a 'substantial' effect on interstate commerce. This the court cannot do.").

39

indictment be dismissed.

D.

Rule 52(b) is discretionary: "A plain error that affects substantial rights <u>may</u> be considered even though it was not brought to the court's attention." Fed. R. Crim. P. 52(b) (emphasis added). The Supreme Court has held that our discretion should be utilized "to correct only 'particularly egregious errors,' those errors that 'seriously affect the fairness, integrity or public reputation of judicial proceedings.'" <u>United States v. Young</u>, 470 U.S. 1, 15, 105 S. Ct. 1038, 1046, 84 L. Ed. 2d 1 (1985) (quoting <u>United States v. Frady</u>, 456 U.S. 152, 163, 102 S. Ct. 1584, 1592, 71 L. Ed. 2d 816 (1982), and <u>United States v. Atkinson</u>, 297 U.S. 157, 160, 56 S. Ct. 391, 392, 80 L. Ed. 555 (1936)). An error may satisfy this standard "independent of the defendant's innocence. Conversely, a plain error affecting substantial rights does not, without more, satisfy the . . . standard, for otherwise the discretion afforded by Rule 52(b) would be illusory." <u>Olano</u>, 507 U.S. at 736-37, 113 S. Ct. at 1779.

The conduct for which Smith was convicted is clearly punishable. The only problem is that it is not punishable <u>federally</u>. Thus, there is some sense in which affirming should not undermine public confidence in the criminal justice system or constitute a miscarriage of justice. In <u>United States v. Walker</u>, 59 F.3d 1196 (11th

40

Cir. 1995), we exercised our discretion under Rule 52(b) to reverse a conviction in light of Lopez, stating that we could "think of no plainer error than to allow a conviction to stand under a statute which Congress was without power to enact." Id. at 1198 (citing Olano for the proposition that an "appellate court should conduct plain error review under Rule 52(b) 'in those cases where a miscarriage of justice would otherwise result'"). Walker is arguably distinguishable in that it invalidated a statute as facially unconstitutional rather than as applied;[13] also, we vacated only one of Walker's convictions, leaving him with a substantial sentence to serve on his remaining drug- and firearm-related convictions. Id. We have found relatively little additional caselaw on this issue. Compare United States v. Suarez, 263 F.3d 468, 489 (6th Cir. 2001) (Boggs, J., dissenting) ("Allowing [the defendant to remain in prison], while largely believing that his prosecution . . . was beyond the power of Congress, would certainly seem to call into question the fairness of the judicial process."), and United States v. Knowles, 29 F.3d 947, 951-52 (5th Cir. 1994) ("[O]ur failure to address [the defendant's Commerce Clause

_____

[13] This distinction is possibly relevant to the question whether a district court has subject matter jurisdiction over a case. Compare Walker, 59 F.3d at 1198 ("In essence, the statute was void ab initio, and consequently, the district court below lacked subject matter jurisdiction with respect to that charge."), with United States v. Viscome, 144 F.3d 1365, 1370 (11th Cir.1998), and Alikhani v. United States, 200 F.3d 732, 735 (11th Cir. 2000) ("An effect on interstate commerce may be required for Congress to have authority under the Commerce Clause to forbid certain conduct. But . . . that does not imply that a district court faced with an insufficient interstate-commerce nexus loses subject-matter jurisdiction of the case." (citation omitted)).

41

challenge] would seriously affect the fairness, integrity, and public reputation of judicial proceedings."), with United States v. Feliciano, 223 F.3d 102, 125-26 (2d Cir. 2000) (stating that "the fourth prong of the Olano plain error inquiry is not satisfied" where the defendant was well aware "that he was committing a very serious felony" and the only issue was "whether he should have been tried in federal or state court").

Tempting as it may be to say that affirming Smith's conviction would not harm the integrity or public reputation of the criminal justice system, we think that it would. The real issue at this point in the case is whether Smith should remain in federal prison for committing acts that the Federal Government lacks the constitutional power to criminalize simply because we think his punishment is deserved. Ultimately, we think that it would undermine public confidence in the judicial system to so blatantly brush aside the limits our Constitution places on the Federal Government, especially after we have so recently enforced those same limits in an essentially indistinguishable case. As we explained in Maxwell,

> Our Nation's Founders were not naive about the risk of an all-encompassing central power, nor, it seems, did they ignore the possibility that the legislature might be tempted to overstep its bounds to legislate ideals favored by its constituencies. Federalism is no academic shibboleth. It is neither an inane legalism, nor an anachronous vestige of a bygone colonial era. The federalist system places a vital check on the power of the central government to

42

trespass on our freedom. Federalism ensures a role for the governments of the states and affords the voting public a more resonant voice in the debate over many legislative issues of principally local concern.

Id. at 1069 (citations omitted). That constitutional limitations on governmental power designed to protect individual freedoms will sometimes benefit evildoers should come as no surprise. "[E]very guarantee enshrined in the Constitution, our basic charter and the guarantor of our most precious liberties, is by it endowed with an independent vitality and value, and this Court is not free to curtail those constitutional guarantees even to punish the most obviously guilty." Stone v. Powell, 428 U.S. 465, 524, 96 S. Ct. 3037, 3066, 49 L. Ed. 2d 1067 (1976) (Brennan, J., dissenting).

In sum, we hold that the fourth prong of Olano is satisfied, and we accordingly exercise our discretion to notice plain error, namely, the failure of the Government to establish that Smith's conduct substantially affects interstate commerce such that it can be validly regulated through federal Commerce Clause legislation.

### IV.

As in Maxwell, "[w]e believe Morrison's framework produces the correct result in this case." Maxwell, 386 F.3d at 1067. Undeniably, our holding limits

the extent to which the Federal Government can prosecute purely intrastate producers and possessors of child pornography. But, to take a step back from our extended analysis of Commerce Clause precedent, there is quite simply no provision of the United States Constitution that grants the Federal Government a general police power of the type that state governments use to prosecute people like Alvin Smith. Federal authority in this area is thus limited to cases involving "Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. Obviously, this is not such a case.

For the foregoing reasons, Smith's convictions are

REVERSED.